PAUL WEINTRAUB et al., Appellants-Respondents, v DONALD BROWN et al., Respondents-Appellants.

Second Department, December 30, 1983

APPEARANCES OF COUNSEL

*Simonson Hess & Liebowitz, P. C.* (*Paul Simonson* on the brief), for appellants-respondents.

*Clark Gagliardi & Miller, P. C.* (*Lawrence T. D'Aloise, Jr.,* of counsel, for Donald Brown, respondent-appellant.

*Meiselman, Farber, Stella & Eberz, P. C.* (*Dennis Gerard Ellis* of counsel), for Suri Pappu and another, respondents-appellants.

OPINION OF THE COURT

MOLLEN, P. J.

The primary question to be resolved on these appeals is whether the parents of an unwanted, but otherwise healthy and normal child, may recover the ordinary costs of raising that child as damages resulting from the defendants' negligence in the performance of a surgical birth control procedure, and, thereafter, in the performance of studies to determine whether the procedure was a success. We begin with a brief review of the facts.

Paul and Rosemary Weintraub, the plaintiffs, instituted this medical malpractice action, alleging that in or about May, 1978, defendant Donald Brown, a licensed physician specializing in surgery and urology, performed a surgical birth control procedure commonly known as a vasectomy on Paul Weintraub at defendant Lawrence Hospital. Dr. Brown was on staff at the hospital and was assisted in the performance of the procedure by other hospital staff members. Defendant Suri Pappu is also a licensed physician and a staff member of Lawrence Hospital. He is a specialist in pathology and he performed pathological and tissue studies after the vasectomy to determine whether it was a success. Dr. Pappu conducted these studies with the assistance of hospital staff members.

Plaintiffs further alleged that defendants Brown, Pappu, and Lawrence Hospital performed the vasectomy and subsequent studies in a negligent manner, and that the negligence was compounded by Dr. Brown's failure to arrange for a postsurgical sperm count.[1] After the vasectomy, the Weintraubs resumed marital relations, resulting in Mrs. Weintraub's impregnation and the birth of a child, which impregnation the vasectomy was intended to prevent. Mr. Weintraub then underwent a second vasectomy. There are no allegations that the child is other than normal and healthy or that defendants' conduct prevented plaintiffs from discovering or safely terminating the pregnancy.

The verified complaint sets forth five causes of action. In the second, third, and fifth causes, Mrs. Weintraub sought recovery for her physical injury and pain caused by the

---

1. Dr. Brown's failure to arrange for the postsurgical sperm count was not alleged as part of the complaint, but rather was included in plaintiffs' verified bill of particulars.

unplanned pregnancy and delivery, severe emotional distress, and loss of her husband's services and consortium. In the first and fourth causes, Mr. Weintraub sought recovery for his physical and emotional pain resulting from the failed vasectomy, his damages attributable to the second vasectomy, his wife's medical expenses, and loss of her services and consortium. In the second cause, both plaintiffs sought recovery for the cost of raising, nurturing and educating a child until the age of majority.

In accordance with CPLR 3211 (subd [a], par 7), defendants Pappu and Lawrence Hospital moved, and defendant Brown cross-moved, to dismiss causes two, three, four, and five, thereby conceding, as they do on appeal, that the first cause was legally sufficient. The court dismissed so much of the second cause as sought recovery of the ordinary costs of raising an unwanted child. However, it concluded that the remainder of the second cause was legally sufficient "insofar as it may be read to plead a cause of action on behalf of Mrs. Weintraub for physical injury and pain occasioned by her unanticipated pregnancy and delivery". The third cause, which sought damages on Mrs. Weintraub's behalf for severe emotional distress, was sustained to the extent of allowing recovery for "[a]ny emotional suffering occasioned by the actual or anticipated physical injury and pain resulting from [Mrs. Weintraub's] unanticipated pregnancy and delivery". The court sustained the fourth cause, brought on Mr. Weintraub's behalf, to recover his wife's medical expenses and for loss of consortium, "insofar as it relates to the pregnancy and delivery of the child". The court added that, "[w]hether any future expenses or loss of consortium will result therefrom is a question of proof at the trial." Finally, the fifth cause, brought on Mrs. Weintraub's behalf for loss of consortium, was found to be legally sufficient "with respect to Mr. Weintraub's vasectomies", the court observing that "the issue of any loss in the future will depend on the proof at trial". Plaintiffs appeal and defendants cross-appeal.

At the outset, we note that the five causes of action set forth in the Weintraubs' complaint are brought under common-law negligence or medical malpractice principles (see *Sorkin v Lee,* 78 AD2d 180, 181 [opn of SIMONS, J., then

Associate Justice of App Div, 4th Dept, now Associate Judge of Ct of Appeals], app dsmd 53 NY2d 797; cf. *Becker v Schwartz,* 46 NY2d 401, 410). Recent interest in this area of the law has resulted in the collective labeling as "wrongful birth" or "wrongful life" actions based upon several fundamentally distinct theories, viz., wrongful birth, wrongful life, wrongful pregnancy or conception, and wrongful diagnosis (see *Becker v Schwartz, supra,* pp 408-410; *Harbeson v Parke-Davis, Inc.,* 98 Wn 2d 460, 465-467, 478; *University of Ariz. Health Sciences Center v Superior Ct. of State of Ariz.,* 136 Ariz 579, 581, n 1).

The theory upon which the plaintiffs' causes of action are based is the so-called wrongful pregnancy or wrongful conception type, "wherein parents, one of whom has undergone an unsuccessful surgical birth control procedure, have sought damages for the birth of an unplanned child. There, damages have not been sought on behalf of the child — a healthy and normal infant — but by the parents for expenses attributable to the birth, including the pecuniary expense of rearing the child" (*Becker v Schwartz, supra,* p 409). Although the Court of Appeals has not as yet passed on the issue, we have held, as have the Appellate Divisions in the other three Judicial Departments, that a cause of action for medical malpractice predicated on a physician's negligence resulting in the birth of a normal child states a legally cognizable claim (see *Debora S. v Sapega,* 56 AD2d 841; *Sala v Tomlinson,* 73 AD2d 724, mot for lv to app dsmd 49 NY2d 701; *Sorkin v Lee, supra,* p 181; *Mears v Alhadeff,* 88 AD2d 827).[2] Both the Third and Fourth Departments have sustained the legal sufficiency of claims seeking recovery, in wrongful conception cases, of damages for, *inter alia,* medical expenses, loss of services and con-

---

**2.** In *Becker v Schwartz* (46 NY2d 401), the Court of Appeals recognized the parents' right to recover as damages the costs for the extraordinary care and treatment of their intended but abnormal child, which damages were the proximate result of their physician's negligence in failing to accurately inform them of the risks involved in a pregnancy, and the negligence was instrumental either in the parents' decision to conceive or their decision not to terminate the pregnancy. Rejected as being legally insufficient was the wrongful life claim, brought on the abnormal child's behalf, for damages allegedly resulting from the physician's negligence.

The *Becker* court was not concerned with the legal sufficiency of a complaint alleging wrongful conception as a cause of action, nor did the court express its views as to whether, and under what circumstances, it would be recognized.

sortium, physical injury and pain arising from the unanticipated pregnancy (see *Sala v Tomlinson, supra; Sorkin v Lee, supra*). These same courts have affirmed dismissals of causes seeking recovery of the ordinary costs of raising an unwanted but otherwise healthy and normal child, holding in essence that such claims are not legally cognizable (see *Sala v Tomlinson, supra,* p 726; *Sorkin v Lee, supra,* p 181). On this appeal we are called upon to determine what elements of damage plaintiffs may properly recover.

There is widespread agreement among the several jurisdictions that have considered the issue that complaints alleging wrongful conception state a valid cause of action (see Tort Liability For Wrongfully Causing One To Be Born, Ann., 83 ALR3d 15, 29). There also is general agreement that the plaintiffs in a wrongful conception action may recover from the tort-feasor for the expenses of the unsuccessful sterilization procedure, the pain and suffering associated with the pregnancy, the costs of delivery, lost wages, and loss of consortium (Ann., 83 ALR3d, at pp 29-30). Disagreement has focused on the issue of whether the plaintiffs in such actions may recover the ordinary costs of raising their unwanted, but normal and healthy, child.

Our research discloses that the majority of jurisdictions deny recovery of child rearing costs (see *Boone v Mullendore,* 416 So 2d 718 [Ala]; *Wilbur v Kerr,* 275 Ark 239; *Coleman v Garrison,* 349 A2d 8 [Del]; *Public Health Trust v Brown,* 388 So 2d 1084 [Fla App]; *White v United States,* 510 F Supp 146 [D Kan]; *Cockrum v Baumgartner,* 95 Ill 2d 193, 447 NE2d 385, cert den *sub nom. Raja v Michael Reese Hosp. & Med. Center,* __ US __ [Oct. 3, 1983]; *Schork v Huber,* 648 SW2d 861 [Ky]; *Kingsbury v Smith,* 122 NH 237; *P. v Portadin,* 179 NJ Super 465; *Mason v Western Pa. Hosp.,* 499 Pa 484, 453 A2d 974; *Terrell v Garcia,* 496 SW2d 124 [Tex Civ App], cert den 415 US 927; *McNeal v United States,* 689 F2d 1200; *Rieck v Medical Protective Co.,* 64 Wis 2d 514; *Beardsley v Wierdsma,* 650 P2d 288 [Wyo]; see, also, *Ball v Mudge,* 64 Wn 2d 247).

Recovery is most frequently denied for what may be broadly called "public policy" reasons, the basis of which is the view that the birth of a healthy and normal child

cannot, as a matter of law, constitute an injury to the child's parents. Illustrative of this view is *Public Health Trust v Brown* (*supra,* pp 1085-1086): "In holding that such a claim should not be recognized, we align ourselves with a clear majority of courts in other jurisdictions which have decided the identical question * * * There is no purpose to restating here the panoply of reasons which have been assigned by the courts which follow the majority rule * * * In our view, however, its basic soundness lies in the simple proposition that a parent cannot be said to have been damaged by the birth and rearing of a normal, healthy child. Even the courts in the minority recognize * * * that the costs of providing for a child must be offset by the benefits supplied by his very existence * * * But it is a matter of universally-shared emotion and sentiment that the intangible but all-important, incalculable but invaluable 'benefits' of parenthood far outweigh any of the mere monetary burdens involved * * * Speaking legally, this may be deemed conclusively presumed by the fact that a prospective parent does not abort or subsequently place the 'unwanted' child for adoption * * * On a more practical level, the validity of the principle may be tested simply by asking any parent the purchase price for that particular youngster. Since this is the rule of experience, it should be, and we therefore hold that it is, the appropriate rule of law. It is a rare but happy instance in which a specific judicial decision can be based solely upon a reflection of one of the humane ideals which form the foundation of our entire legal system. This, we believe, is just such a case".

The Court of Civil Appeals of Texas articulated the public policy argument somewhat more emotionally: "[A] strong case can be made that, at least in an urban society, the rearing of a child would not be a profitable undertaking if considered from the economics alone. Nevertheless * * * the satisfaction, joy and companionship which normal parents have in rearing a child make such economic loss worthwhile. These intangible benefits, while impossible to value in dollars and cents are undoubtedly the things that make life worthwhile. Who can place a price tag on a child's smile or the parental pride in a child's achievement? Even if we consider only the economic point of view, a child

is some security for the parents' old age. Rather than attempt to value these intangible benefits, our courts have simply determined that public sentiment recognizes that these benefits to the parents outweigh their economic loss in rearing and educating a healthy, normal child. We see no compelling reason to change such rule at this time" (*Terrell v Garcia, supra,* p 128).

The public policy position was recently expressed in *Cockrum v Baumgartner* (95 Ill 2d 193, __, 447 NE2d 385, 389, *supra*), where the Supreme Court of Illinois concluded: "[T]he holding of a majority of jurisdictions that the costs of rearing a normal and healthy child cannot be recovered as damages to the parents is to be preferred. One can, of course, in mechanical logic reach a different conclusion, but only on the ground that human life and the state of parenthood are compensable losses. In a proper hierarchy of values the benefit of life should not be outweighed by the expense of supporting it. Respect for life and the rights proceeding from it are at the heart of our legal system and, broader still, our civilization".

In a similar vein, courts have expressed concern about the possible adverse effects upon the child involved in wrongful pregnancy litigation. The Supreme Court of Alabama described it this way: "Another problem is the possible harm that can be caused to the unwanted child who will one day learn that he not only was not wanted by his or her parents, but was reared by funds supplied by another person. Some authors have referred to such a child as an 'emotional bastard' in a realistic, but harsh, attempt to describe the stigma that will attach to him once he learns the true circumstances of his upbringing" (*Boone v Mullendore,* 416 So 2d 718, 722, *supra; accord Wilbur v Kerr,* 275 Ark 239, 242, *supra*). The District Court of Appeal of Florida, Third District, warned that a rule permitting recovery "would thus engender the unseemly spectacle of parents disparaging the 'value' of their children or the degree of their affection for them in open court. It is obvious, whether the conclusion is phrased in terms of 'public policy,' * * * or otherwise, that such a result cannot be countenanced" (*Public Health Trust v Brown,* 388 So 2d 1084, 1086, n 4, *supra*). This result, courts have concluded,

would run counter to the public policy favoring the development and preservation of family relations (see *Cockrum v Baumgartner,* 95 Ill 2d 193, __, 447 NE2d 385, 390, *supra*).

A less frequently cited reason for denying recovery is that the damages attributable to the costs of raising a normal child are too speculative (see, e.g., *Sorkin v Lee,* 78 AD2d 180, 181, *supra; Coleman v Garrison,* 349 A2d 8, 12, *supra*). Moreover, as noted by the Supreme Court of Illinois in *Cockrum v Baumgartner (supra,* p __, p 388): "[R]equiring the payment of rearing costs would impose an unreasonable burden upon a defendant, unreasonable because it would permit the plaintiffs to enjoy the benefits of parenthood, while shifting all of the expenses to the defendant. That burden, the courts say, is out of proportion to the fault involved" (accord *Sorkin v Lee, supra,* p 184; *White v United States,* 510 F Supp 146, 159, *supra; Schork v Huber,* 648 SW2d 861, 863, *supra*).

Discussion of damages has led some courts to suggest that recovery be denied in accordance with the general law of damages, which states that a plaintiff cannot recover for elements of damage he could have reasonably avoided (see *Cockrum v Baumgartner,* 95 Ill 2d 193, __, 447 NE2d 385, 390, *supra,* citing Dobbs, Remedies, § 8.9, p 579 [1973]). Pursuant to this rule, recovery might be denied in cases where either abortion or adoption was available (see *Sorkin v Lee,* 78 AD2d 180, 181-182, *supra*). Other courts have recoiled from this position (e.g., *University of Ariz. Health Sciences Center v Superior Ct. of State of Ariz.,* 136 Ariz 579, 586, n 5, *supra; Stills v Gratton,* 55 Cal App 3d 698, 709; *Troppi v Scarf,* 31 Mich App 240, mot for lv to app den 385 Mich 753).

Lastly, there is the concern that to allow recovery for the ordinary costs of raising a child "would open the door to various false claims and fraud" (*Cockrum v Baumgartner,* 95 Ill 2d 193, __, 447 NE2d 385, 388, *supra*).

Six jurisdictions, holding to the contrary view, have permitted recovery of ordinary child rearing costs. Recovery in five of those jurisdictions, however, is to be reduced or offset by the benefits accruing to the family as a consequence of the child's birth (see *University of Ariz. Health*

*Sciences Center v Superior Ct. of State of Ariz.,* 136 Ariz 579, 667 P2d 1294, *supra; Stills v Gratton, supra; Ochs v Borrelli,* 187 Conn 253, 445 A2d 883; *Troppi v Scarf, supra; Sherlock v Stillwater Clinic,* 260 NW2d 169 [Minn]). One jurisdiction apparently allows recovery without an offset (see *Bowman v Davis,* 48 Ohio St 2d 41)[3] and another has intimated that recovery with an offset will be allowed in the future (see *Hartke v McKelway,* 707 F2d 1544 [DC Cir], cert den __ US __ [Nov. 14, 1983]).

The basis for the benefits offset rule is found in section 920 of the Restatement of Torts, Second, which provides: "When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable".

Explaining the rule, the Court of Appeals of Michigan, Division 1, noted: "The essential point, of course, is that the trier must have the power to evaluate the benefit according to all the circumstances of the case presented. Family size, family income, age of the parents, and marital status are some, but not all, the factors which the trier must consider in determining the extent to which the birth of a particular child represents a benefit to his parents. That the benefits so conferred and calculated will vary widely from case to case is inevitable" (*Troppi v Scarf,* 31 Mich App 240, 257, *supra*). In this regard, great weight is placed on the parents' reason or reasons for deciding that one or the other of them would undergo the birth control procedure (see *Hartke v McKelway, supra,* p 1555; see Note, Wrongful Conception: Who Pays For Bringing up Baby?, 47 Ford L Rev 418, 430-435).

The courts permitting recovery reject the majority view that to do so violates public policy (see *Sherlock v Stillwater Clinic, supra,* p 175). Some courts, for example, have stated that the denial of recovery impermissibly

---

**3.** A second case, *Custodio v Bauer* (251 Cal App 2d 303), also appears to have permitted recovery without an offset. However, California intermediate appellate court decisions since *Custodio,* e.g., *Stills v Gratton* (55 Cal App 3d 698), and *Morris v Frudenfeld* (135 Cal App 3d 23), permit recovery with an offset. Since *Gratton* and *Morris* were decided subsequent to *Custodio,* and, further, since the Supreme Court of California has not yet ruled on the issue, *Stills* and *Morris* should be read as having modified *Custodio* to the extent of permitting recovery with an offset.

infringes on the parents' fundamental right to choose not to procreate (see *Bowman v Davis, supra,* p 46; *Ochs v Borrelli,* 187 Conn 253, __, 445 A2d 883, 885, *supra; Troppi v Scarf, supra,* pp 253-254). Other courts have held that public policy is not involved in cases where recovery is sought on the ground that a sterilization procedure was negligently performed (see *University of Ariz. Health Sciences Center v Superior Ct. of State of Ariz.,* 136 Ariz 579, 583-584, *supra*). The courts permitting recovery of child rearing costs have also discounted the majority's fears concerning the possible adverse effects on the so-called unwanted child in wrongful pregnancy cases, leaving it to the parents to "weigh the risk" of harm to the child (*Hartke v McKelway, supra,* p 1552, n 8; accord *University of Ariz. Health Sciences Center v Superior Ct. of State of Ariz., supra,* p 585).

The argument pertaining to the speculative nature of child rearing costs as recoverable damages is rejected by the minority on the ground that such damages are no more speculative than, for example, damages for loss of consortium, pain and suffering, and wrongful death (see *Hartke v McKelway, supra,* p 1552, n 8; *Troppi v Scarf,* 31 Mich App 240, 260-262, *supra; Ochs v Borrelli,* 187 Conn 253, __, 445 A2d 883, 886, *supra;* see, also, *Sorkin v Lee,* 78 AD2d 180, 185-186 [HANCOCK, J., dissenting], *supra; Cockrum v Baumgartner,* 95 Ill 2d 193, __, 447 NE2d 385, 394 [CLARK, J., dissenting], *supra*).

In sum, those jurisdictions permitting recovery of the "reasonably foreseeable" child rearing costs do so because, they have concluded, there is no basis in law or logic to immunize or hold harmless a health care provider from the proximate results of his negligence (e.g., *Sherlock v Stillwater Clinic,* 260 NW2d 169, 176, *supra*).

■ We have carefully considered the competing legal and ethical viewpoints expressed in this nettlesome area of the law, viewpoints which challenge the fundamental assumptions of our legal system and values. We conclude, as has the majority of the jurisdictions which have decided the issue, that denial of ordinary child rearing costs in wrongful pregnancy actions is to be preferred. As a matter of public policy we are unable to hold that the birth of an

unwanted but otherwise healthy and normal child constitutes an injury to the child's parents and is, therefore, compensable in a medical malpractice action. Such a holding would be incompatible with contemporary views concerning one of life's most precious gifts — the birth of a normal and healthy child. We are loath to adopt a rule, the primary effect of which is to encourage, indeed reward, the parents' disparagement or outright denial of the value of their child's life. While we attempt not to adjudicate cases which come before us on the basis of emotion, sentiment, or personal preferences, a proper respect for the value of life — a cornerstone of our legal system — does not run counter to this principle. Accordingly, we affirm that part of the order under review which dismisses so much of the second cause of action as seeks to recover ordinary child rearing costs.

■ Our decision today does not immunize health care providers from all liability in wrongful pregnancy actions, assuming that the prerequisites to liability can be established.[4] We affirm so much of the order as sustains that portion of the second cause of action seeking to recover damages in Mrs. Weintraub's behalf for physical pain and suffering resulting from her unanticipated pregnancy. Also affirmed is so much of the order as sustains the fourth cause of action brought on Mr. Weintraub's behalf to recover damages for the medical expenses for the care and treatment of his wife during pregnancy and delivery of the baby, and for the loss of her services and consortium. In our view, the afore-mentioned portion of the second cause, and the fourth cause state legally cognizable claims (see *Sorkin v Lee,* 78 AD2d 180, 184, *supra*).

We are also of the view that a cause of action brought on Mrs. Weintraub's behalf seeking to recover for emotional distress resulting from the actual or anticipated physical pain and suffering associated with the pregnancy and delivery, states a legally cognizable claim. As recently noted by the Court of Appeals: "Where a party's negligence is directly responsible for physical injury to another, there is no question but that the injured party may recover both

---

4. As noted *ante,* defendants have conceded that the first cause of action brought in Mr. Weintraub's behalf is legally sufficient.

for the actual physical injury sustained and for the concomitant mental and emotional suffering which flow as a natural consequence of the wrongful act" (*Howard v Lecher,* 42 NY2d 109, 111). We therefore affirm so much of the order as sustains in part and dismisses in part the third cause of action.

However, so much of the order as sustains that portion of the fifth cause of action which seeks to recover damages on Mrs. Weintraub's behalf for the loss of consortium resulting from both vasectomies was error. Inasmuch as Mr. Weintraub's first vasectomy was performed at his request, recovery, if any, should be limited to the loss of consortium resulting from the second vasectomy.[5]

Accordingly, the order under review should be modified, on the law, so as to provide that so much of the fifth cause of action as seeks recovery of damages on behalf of the plaintiff Rosemary Weintraub for loss of consortium resulting from the first vasectomy procedure undergone by the plaintiff Paul Weintraub is dismissed. As so modified, the order under review should be affirmed, without costs or disbursements.

DAMIANI, MANGANO and GULOTTA, JJ., concur.

Order of the Supreme Court, Westchester County, entered April 4, 1983, modified, on the law, by adding thereto a provision dismissing so much of the fifth cause of action asserted in plaintiffs' verified complaint as seeks damages on behalf of plaintiff Rosemary Weintraub for loss of consortium resulting from the first vasectomy procedure undergone by plaintiff Paul Weintraub. As so modified, order affirmed, without costs or disbursements.

---

5. We are not to be understood as expressing our view as to the merits of plaintiffs' remaining causes of action. This case came to us in the posture of a facial challenge to the legal sufficiency of the causes of action stated in the complaint. Consequently, we assume plaintiffs' allegations to be true (see *Becker v Schwartz,* 46 NY2d 401, 408).