OPINION OF THE COURT
Sheila Abdus-Salaam, J.
Ordered that this motion by defendant Carlo Acosta for an order pursuant to CPLR 3212 dismissing the complaint, the motion by defendant Reginald Puckett, M.D. (motion sequence No. 003) for an order pursuant to CPLR 3212 dismissing the complaint, and the motion by defendant Martin Keltz, M.D. (motion sequence No. 004) for an order pursuant to CPLR 3211 (a) (7) and 3212 dismissing the complaint are consolidated here for disposition. The motions are granted to the extent indicated below and are otherwise denied. The cross motion by plaintiffs for an order pursuant to CPLR 3212 granting them summary judgment on the issue of liability is granted only to the extent that a judgment of liability is granted against defendant Acosta as indicated below.
This is a medical malpractice action and negligence action which also includes causes of action for lack of informed consent, breach of contract, fraud and assault and battery. The action arises out of an in vitro fertilization (IVF) procedure that was performed at defendant New York Medical Services for Reproductive Medicine (NYMSFRM). Plaintiffs Nancy Andrews and Thomas Andrews, a married couple, allege that the IVF procedure which they agreed to undergo was intended to result in the fertilization of Mrs. Andrews’ eggs with Mr. Andrews’ sperm so that they could have a child who would be biologically their own, but that defendants negligently used someone else’s sperm to fertilize the eggs.
According to plaintiffs, shortly after their daughter Jessica was born in October 2004, they knew something was amiss based upon Jessica’s physical characteristics. Mrs. Andrews “was born in the Dominican Republic and has a complexion, skin coloration and facial characteristics typical of that region” while Mr. Andrews is Caucasian. (Andrews’ affidavit If 11.) The Andrews describe Jessica as “darker skinned” than both of them, with “skin, facial and hair characteristics more typical of African, or African-American descent.” (Andrews’ affidavit *942 U 11.) Nancy Andrews says that she questioned Dr. Keltz about this “abnormality” and that Dr. Keltz responded that it was normal, that the FVF was performed properly, and that Jessica would “ ‘get lighter over time.’ ” (Andrews’ affidavit 1111.)
The Andrews explain that by December 2004 they knew that something was clearly wrong, so they purchased a home DNA kit and sent it to a lab for processing. The results confirmed that Mr. Andrews and Jessica lacked the genetic markers that would be required if he were her biological father. Two subsequent DNA tests confirmed this result.
The complaint sounds in medical malpractice against defendant Dr. Keltz, the physician who suggested the IVF procedure and who performed the implantation of the fertilized eggs; NYMSFRM, the clinic where the procedure was performed; and Reginald Puckett, M.D., both in his individual capacity and in his capacity as owner and managing entity of NYMSFRM, an unincorporated entity. The complaint sounds in negligence against defendant Carlo Acosta, who is not a physician. He was allegedly the embryologist who processed the eggs and sperm and used them to create and culture the embryos. All three plaintiffs seek damages for severe emotional distress. There is also a cause of action by Nancy Andrews against all defendants for lack of informed consent; a cause of action by Nancy Andrews against defendants Acosta, Puckett and NYMSFRM for breach of contract; a cause of action by Nancy Andrews against defendant Keltz for fraud; and a cause of action by Nancy Andrews against all defendants for assault and battery.
A default judgment with respect to liability has previously been granted against defendants NYMSFRM and Reginald Puckett only in his capacity as owner and managing entity of NYMSFRM. There is no indication in the motion papers that any discovery has been conducted.
The Causes of Action Sounding in Negligence and Medical
Malpractice
Asserted by Plaintiffs Nancy and Thomas Andrews
Defendants Dr. Keltz and Carlo Acosta assert that plaintiffs have not stated a cause of action because (a) plaintiffs seek emotional damages without having sustained any physical injury, and (b) their claim sounds in “wrongful life” or “wrongful conception,” a cause of action which is not recognized in New York. The bill of particulars includes allegations that *943 plaintiffs have been injured in that they are “now the parents of a child, JESSICA[,] who is only half their genetic make-up” (bill of particulars for defendant Acosta 1111). The Andrews have particularized their injuries as follows:
“Uncertaintly [sic] about the genetic makeup health & future of the child JESSICA; in that JESSICA & both parents have been forced to raise a child that is not even the same race, nationality, color & descent of them & other family members; in that same will cause confusion, ill ease, depression and emotion [sic] strain and damage for the entire life of all the parties involved as well as the unnamed siblings, unnecessary curiosity, questioning & emotional damages all of which have yet to be played out & identified; that JESSICA & her parents have, are, & will in the future be caused to suffer extreme emotional distress & uncertainty as to her identity; that it is not possible & even less, not desirable, to identify the sperm doctor [sic] as this would cause irreparable harm to all parties & potentially invoke rights & privileges & infringe on the exclusive rights of JESSICA, and NANCY & THOMAS as parents; in that the parents have been caused to suffer exactly what they intended to avoid & exactly what they were NOT promised by the process provided by the answering defendant; that there is continuing uncertainty & distrust as to whether the genetic material of either NANCY &/or THOMAS has been inappropriately used for others; that they may have natural children or half children that they are unaware of” (bill of particulars for defendant Acosta If 11).
Plaintiffs also assert that Jessica has been injured in that
“she may be subjected to physical & emotional illness as a result of not being the same race as her parents & siblings; that invariably JESSICA will learn of the events of this case & suffer undefined physical & emotional damages thereby; that JESSICA will be or that she & her parents will be emotionally damaged by the anticipation or reality of her ridicule” (bill of particulars for defendant Acosta 1111).
Many of the injuries identified by Mr. and Mrs. Andrews are not compensable in view of the principles established by existing case law. For example, in O’Toole v Greenberg (64 NY2d 427 *944 [1985]), the Court of Appeals held that a husband and wife could not recover the ordinary costs of raising a healthy, normal child born after an unsuccessful tubal ligation operation. The Court wrote that resolution of whether the plaintiffs had stated a cause of action required
“first a determination as to whether plaintiffs have suffered a legally cognizable harm by the birth of a healthy child. It is a fundamental principle of Anglo-American tort law that an act contrary to law, which does not result in legal harm — injuria absque damnum — is not actionable and does not give rise to any claim or cause.” (Id. at 431 [citations omitted].)
Noting that “[t]his court has recognized the ‘very nearly uniform high value’ which the law and mankind have placed upon human life,” the Court concluded that “it cannot be said, as a matter of public policy, that the birth of a healthy child constitutes a harm cognizable at law.” (Id. at 432 [citations omitted].)
Similarly, in Weintraub v Brown (98 AD2d 339 [1983]), the Second Department held that as a matter of public policy, parents could not recover the ordinary costs of raising a healthy child that would be incurred due to defendants’ negligence in performing a vasectomy, although they could recover damages for the woman’s pain and suffering resulting from an unanticipated pregnancy, for the husband’s loss of consortium and for the expense of a second vasectomy. After reviewing the law in various jurisdictions on the issue of whether there could be recovery for child-rearing costs, the court “carefully considered the competing legal and ethical viewpoints expressed in this nettlesome area of the law, viewpoints which challenge the fundamental assumptions of our legal system and values.” (Id. at 348.) The Second Department concluded:
“As a matter of public policy we are unable to hold that the birth of an unwanted but otherwise healthy and normal child constitutes an injury to the child’s parents and is, therefore, compensable in a medical malpractice action. Such a holding would be incompatible with contemporary views concerning one of life’s most precious gifts — the birth of a normal and healthy child. We are loath to adopt a rule, the primary effect of which is to encourage, indeed reward, the parents’ disparagement or outright denial of the value of their child’s life. While we attempt not to adjudicate cases which come before us on the basis *945 of emotion, sentiment, or personal preferences, a proper respect for the value of life — a cornerstone of our legal system — does not run counter to this principle.” (98 AD2d at 348-349.)
In Jean-Charles v Planned Parenthood Assn. of Mohawk Val. (99 AD2d 542 [1984]), the complaint alleged negligent performance of an abortion that resulted in the birth of a healthy child. The mother sought recovery for the costs of raising the child as well as for mental distress. The Second Department, citing Weintraub (supra) held that the plaintiff could not recover the costs of raising the child or for mental distress, except to the extent that the distress resulted from the actual and anticipated physical pain and suffering associated with pregnancy and delivery.
The Andrews allege that, due to defendants’ negligence, they have been forced to raise a child that is “not even the same race, nationality, color” as they are (bill of particulars for Acosta 1111). They aver that
“[w]hile we love Baby Jessica as our own, we are reminded of this terrible mistake each and every time we look at her; it is simply impossible to ignore. This brings with it an unending feeling of helplessness and despair. We are conscious of, and distressed by this mistake, each and every time we appear in public.” (Andrews’ affidavit 1Í13.)
However, not only have the courts of New York determined that the birth of a healthy child is not a cognizable injury, the courts have also declined to recognize parents’ claims for emotional distress as the result of a child born with a serious disease (see Becker v Schwartz, 46 NY2d 401 [1978]; Goldstein v Ob-Gyn Assoc., 170 AD2d 374 [1991], lv dismissed 78 NY2d 1006 [1991]; Paretta v Medical Offs. for Human Reproduction, 195 Misc 2d 568 [2003]). As was noted by the Court of Appeals in Becker (supra):
“To be sure, parents of a deformed infant will suffer the anguish that only parents can experience upon the birth of a child in an impaired state. However, notwithstanding the birth of a child afflicted with an abnormality, and certainly dependent upon the extent of the affliction, parents may yet experience a love that even an abnormality cannot fully dampen. To assess damages for emotional harm endured by the parents of such a child would, in all fairness, require consideration of this factor in miti *946 gation of the parents’ emotional injuries. (See Restatement, Torts, § 920.) . . . [Ujnlike plaintiffs’ causes of action for pecuniary loss in the instant cases, calculation of damages for plaintiffs’ emotional injuries remains too speculative to permit recovery notwithstanding the breach of a duty flowing from defendants to themselves. As in the case of plaintiffs’ causes of action for damages on behalf of their infants for wrongful life, the cognizability of their actions for emotional harm is a question best left for legislative address.” (46 NY2d at 414-415.)
By logical extension of the principles enunciated by the courts in New York that the birth of an unwanted but otherwise healthy and normal child does not constitute an injury to the child’s parents, and that even parents of a child with a serious disease cannot recover for emotional injury for the birth of that child, plaintiffs in this case cannot recover for mental distress arising from having a child who is not Mr. Andrews’ biological offspring. The decision in Perry-Rogers v Obasaju (282 AD2d 231 [2001], lv dismissed 97 NY2d 638 [2001]), which is cited by plaintiffs, is not to the contrary. In that case, a married couple’s embryos were mistakenly implanted in a person whom defendants would not identify, and the information about the mistake was not conveyed to plaintiffs until after the other woman had become pregnant. In Perry-Rogers, the First Department denied defendants’ motion to dismiss the complaint for failure to state a cause of action, holding that the plaintiffs had stated a claim for emotional harm “caused by their having been deprived of the opportunity of experiencing the pregnancy, prenatal bonding and the birth of their child, and by their separation from the child for more than four months after his birth.” (Id. at 231 [citation omitted].) In so ruling, the Court rejected defendants’ argument that plaintiffs’ claim was not actionable because it sought damages for emotional harm caused by the creation of human life, noting that “[p]laintiffs do not seek damages for the emotional harm caused by the birth of a sick or unplanned healthy child, and would not otherwise have the court calculate the difference between existence and nonexistence.” (Id.)
While Perry-Rogers does not support plaintiffs’ assertion that they have stated a cause of action for emotional distress based upon having a child who is not the biological child of Mr. Andrews and who is a different race and color than the Andrewses, the Perry-Rogers court recognized that damages could be recovered for emotional harm even in the absence of physical *947 injury to the plaintiffs. The Andrewses have alleged that they have suffered emotional injury separate and apart from Jessica’s birth.
Plaintiffs cannot recover damages based upon their claim that they were deprived of the opportunity to have a child of their own genetic makeup. The Court of Appeals has rejected as too speculative a claim that is “based essentially on ‘wrongful non-birth,’ the deprivation of an opportunity [of a woman] to have a child by her husband” (Cohen v Cabrini Med. Ctr., 94 NY2d 639, 644 [2000]). But plaintiffs also claim that there is continuing uncertainty and distrust as to whether the genetic material of either or both of them has been inappropriately used for others and that they may have natural children or half children that they are unaware of, and that they fear that Jessica’s natural father may someday claim rights to Jessica, thereby interfering with their rights and relationship as her parents. Such a claim is not barred by any public policy consideration as were the claims in Becker v Schwartz (46 NY2d 401 [1978]), O’Toole v Greenberg (64 NY2d 427 [1985]) and Weintraub v Brown (98 AD2d 339 [1983]). Additionally, under these circumstances, where the Andrews undertook “the rigors of in vitro fertilization” (Perry-Rogers at 232) only to learn that Mr. Andrews’ genetic material had not been used to conceive their daughter, and they have been provided with absolutely no explanation as to how this occurred or what was done with the sperm that he provided to the clinic for the sole purpose of conceiving a child with his wife, there is a “ ‘guarantee of genuineness’ ” (Johnson v State of New York, 37 NY2d 378, 384 [1975]) of the claimed mental distress to permit plaintiffs to recover for emotional injuries absent the presence of physical injury (Perry-Rogers; see also Fosby v Albany Mem. Hosp., 252 AD2d 606 [1998]; but see Creed v United Hosp., 190 AD2d 489 [1993] to the contrary).
Accordingly, the Andrewses claims for emotional distress are permitted to the extent indicated and are otherwise dismissed.
The Causes of Action Asserted on Behalf of Jessica
Jessica’s claims for emotional distress are dismissed. Under the facts here, there was no legal duty of care by defendants to Jessica. Any negligence on the part of defendants certainly took place before Jessica was in útero. Thus, plaintiffs’ argument that defendant owed a duty of care to the developing fetus is unpersuasive, and their citation to Broadnax v Gonzalez (2 NY3d 148 [2004]) is inapposite. In Leighton v City of New York *948 (39 AD3d 84 [2007]), the Second Department recently held that an infant plaintiff who is born alive and alleges that her injuries resulted from an accident which occurred while she was in útero had stated a cause of action. This reasoning should not be extended to apply to an individual who was not yet in útero when the alleged negligence occurred. As was noted by the Court of Appeals in Cohen v Cabrini Med. Ctr. (94 NY2d 639, 642 [2000]),
“The imposition of a legal duty of care does not turn merely on the foreseeability of the harm resulting from an actor’s conduct (see, Tobin v Grossman, 24 NY2d 609, 615) . . . Rather, as we have repeatedly emphasized, ‘[c]ourts resolve legal duty questions by resort to common concepts of morality, logic and considerations of the social consequences of imposing the duty’ (Tenuto v Lederle Labs., 90 NY2d 606, 612).”
Based upon the foregoing, the court concludes that defendants did not owe a duty of care to Jessica and that her claims must be dismissed.
The Causes of Action Asserted against Reginald Puckett, M.D.
As has been noted, a default judgment with respect to liability has previously been granted against defendant Reginald Puckett only in his capacity as owner and managing entity of NYMSFRM. He has demonstrated that the claims against him individually must be dismissed for failure to state a cause of action. He has averred that he did not participate in the care and treatment of the plaintiffs and the Andrewses do not state that they had any involvement with Dr. Puckett. Thus, the causes of action against Reginald Puckett, M.D. as an individual are dismissed.
The Causes of Action against Martin Keltz, M.D. and Carlo Acosta for Breach of Contract and Assault and Battery
Defendants have moved to dismiss the breach of contract claim for failure to state a cause of action. Defendant Acosta argues that there is no right to recover for emotional distress resulting from breach of contract. With respect to the cause of action for assault and battery, defendant Acosta points out that he never touched Mrs. Andrews. Dr. Keltz, who performed the implantation of the fertilized eggs, argues that there is no evidence that he knew that Mr. Andrews’ sperm had not been used *949 to fertilize the eggs and that he intentionally implanted the embryos with this knowledge. Battery is an intentional tort. “Intent involves the state of mind with which an act is done. The intent required for battery is intent to cause a bodily contact that a reasonable person would find offensive.” (PJT 3:3 [2006].) Both defendants also allege that the assault and battery claim is time-barred, although in answering the initial complaint, only defendant Acosta raised this as an affirmative defense, and in answering the amended supplemental complaint filed in October 2005, neither Keltz nor Acosta have asserted the statute of limitations as an affirmative defense.* Plaintiffs have not addressed defendants’ motion to the extent that they seek dismissal of the causes of action for breach of contract and assault and battery. Accordingly, those causes of action are dismissed without opposition.
The Causes of Action against Martin Keltz, M.D., for Medical Malpractice, Lack of Informed Consent and Fraud
There is no dispute that Dr. Keltz was not involved with the collection of Mr. Andrews’ sperm or with the fertilization of the eggs. He performed the implantation of the fertilized eggs. Plaintiffs have not stated a cause of action against Dr. Keltz for medical malpractice. Dr. Keltz has denied in his answer that he was an employee of the clinic and he has also submitted an affidavit stating that he was not an employee of the clinic. Plaintiffs’ statements that Dr. Keltz’s office made the appointment for them at the clinic and that Dr. Keltz did not give them the option to use a different clinic are insufficient to indicate that there is any basis for holding Dr. Keltz liable for the clinic’s negligence. Accordingly, the cause of action for medical malpractice is dismissed.
Dr. Keltz has also moved to dismiss the claim for lack of informed consent, arguing that he informed Mrs. Andrews of *950 the reasonably foreseeable risks of the in vitro procedure, and that the risk that another individual’s sperm would be used was not reasonably foreseeable. Even the Andrews state that they were never informed that “this type of mishap could occur, and frankly, this type of mishap is almost unimaginable.” (Andrews’ affidavit 1113.) It is important to note that plaintiffs are urging that the doctrine of res ipsa loquitur is applicable here in that the wrong sperm could not have been used in the absence of defendants’ negligence (see complaint, bills of particulars). Significantly, while plaintiffs have submitted an expert’s affirmation in support of their cross motion for summary judgment, the expert fails to mention anything about the lack of informed consent claim or to identify any qualitative insufficiency of the information provided to Mrs. Andrews (see generally Gardner v Wider, 32 AD3d 728 [2006]). The court concludes that, as a matter of law, the possibility that defendants would be negligent by failing to use the proper sperm is not a reasonably foreseeable risk of the procedure and does not support plaintiffs’ lack of informed consent claim. Accordingly, Dr. Keltz is granted summary judgment on that claim pursuant to CPLR 3212 (b).
Finally, with respect to the fraud cause of action, plaintiffs have not opposed dismissal of that claim and it is dismissed for failure to state a cause of action.
The Causes of Action against Carlo Acosta for Negligence and Lack of Informed Consent
Plaintiffs have alleged that defendant Acosta held himself out to plaintiff Nancy Andrews as. a competent embryologist, competent in the fields of embryology, sperm collection and transfer. While defendant Acosta has denied this in his answer, his counsel have conceded that Acosta was “the embryologist who processed the egg and sperm and cultured the embryo used in the IVF procedure” (memorandum at 2). That he was the embryologist who fertilized Mrs. Andrews’ eggs is tacitly conceded by Mr. Acosta in his affidavit in support of his motion for summary judgment. In that affidavit, he outlines the things that he did not do, such as harvest the eggs or the sperm, implant the embryo into Mrs. Andrews or consult with or advise the Andrewses. He does not deny in that affidavit that he was the embryologist who fertilized Mrs. Andrews’ eggs.
Mr. Acosta explains that, as the embryologist, he receives the liquids containing the eggs and the sperm that have been harvested, he processes the eggs and the sperm and he uses the *951 eggs and the sperm to create and culture embryos. Once they are created and cultured, he returns the cultured embryos to the patient’s physician.
In support of plaintiffs’ cross motion for summary judgment, the Andrewses have submitted an affidavit in which Mr. Andrews explains what occurred on January 16, 2004 at the offices of the clinic. He says that, on that day, there appeared to be only two employees or staff, a man and a woman, as well as Dr. Stein, who performed the surgical procedure to remove Mrs. Andrews’ eggs. Mr. Andrews says that the man handed him a packaged specimen cup, which he took into a separate room. Once he deposited his sperm into the cup, he wrote his name on the cup’s label, put the cover back on and gave it to the man. Afterward, he went to visit his wife who was undergoing the procedure to remove her eggs.
Defendant Acosta has not submitted any affidavit in opposition to plaintiffs’ cross motion and in reply to his motion for summary judgment. Rather, his counsel has submitted an affirmation reiterating, among other arguments, the position that all claims for emotional injury must be dismissed. Defendant Acosta has remained mute as to what, if any, steps he took to ensure that he was fertilizing Mrs. Andrews’ eggs with Mr. Andrews’ sperm, and has not denied or addressed Mr. Andrews’ statement that plaintiff deposited his sperm in a cup which he labeled with his name. Defendant does not dispute that the doctrine of res ipsa loquitur is applicable to this situation and that it creates a presumption of negligence. Although it is possible for res ipsa loquitur to serve as a basis for granting a plaintiff summary judgment, it is “only in the rarest of res ipsa loquitur cases may a plaintiff win summary judgment or a directed verdict. That would happen only when the plaintiffs circumstantial proof is so convincing and the defendant’s response so weak that the inference of defendant’s negligence is inescapable.” (Morejon v Rais Constr. Co., 7 NY3d 203, 209 [2006].)
This court believes that this is the type of rare res ipsa loquitur case where plaintiffs are entitled to summary judgment. They have come forth with convincing circumstantial evidence and defendant’s response with respect to that evidence could not be weaker — it is nonexistent.
Accordingly, plaintiffs are granted summary judgment against defendant Acosta on liability with respect to the negligence cause of action.
Finally, the lack of informed consent cause of action against defendant Acosta is dismissed without opposition.
*952 Ordered that the clerk enter judgment dismissing the complaint against defendants Martin Keltz, M.D. and Reginald Puckett, M.D. (only in his individual capacity) and severing the action against the remaining defendants; and it is further ordered that the causes of action by Nancy Andrews and Thomas Andrews for negligence are dismissed only to the extent indicated in this decision; that the causes of action by Jessica Andrews are dismissed; and that the causes of action for breach of contract, lack of informed consent, assault and battery and fraud are also dismissed.

 Upon consideration of the motion papers, the court noticed that, although an amended complaint had been served in October 2005, the only answer to this pleading that was included in the motion papers was the amended answer served by defendant Puckett. Upon inquiry to counsel for plaintiffs and defendants Acosta and Keltz, the court was informed that answers to the amended complaint had never been served. Counsel for plaintiffs, defendant Keltz and defendant Acosta stipulated that defendants would serve amended answers that would be deemed served nunc pro tunc. Those answers were delivered to the court and are included as part of these motion papers.