**Layne HARDIN and Katherine LeBlanc, Appellants**

v.

**OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES P.A., n/k/a Obstetrical and Gynecological Associates, PLLC, Texas Andrology Services, LLC and Tobie Devall, Appellees**

**NO. 01-15-01004-CV**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued June 6, 2017

Jamie D. Matuska, MATUSKA LAW FIRM, 2809 Highway 69 North, Nederland, TX 77627, David E. Bernsen, THE BERNSEN LAW FIRM, 420 North MLK, Jr. Parkway, Beaumont, TX 77701, for Appellants.

J. Lee Hoffoss, Jr., 517 West College Street, Lake Charles, LA 70605, for Appellees.

Panel consists of Justices Massengale, Brown, and Huddle.

## OPINION

Harvey Brown, Justice

This appeal concerns whether there can be recovery of mental-anguish damages after sperm is stolen from a cryopreservation lab and used to produce a healthy child, when the evidence of mental anguish includes not only distress over the birth and life of the child but also distress over the mother's separate bad acts directed at the father during the pregnancy.

Before undergoing a vasectomy, Layne Hardin contracted to have his sperm frozen and stored at a cryopreservation lab later operated by Obstetrical and Gynecological Associates PLLC (OGA). The storage contract was between the lab, Hardin, and Hardin's then-domestic partner, Katherine LeBlanc. The contract, signed in 2002, provided that LeBlanc was given dispositional authority over the sperm in the event the relationship between Hardin and LeBlanc ended.

Hardin and LeBlanc ended their relationship a couple years later when Hardin began dating Tobie Devall. During the course of their relationship, Hardin told Devall that his sperm was stored in a Houston lab, and they went to OGA for consultation regarding Devall's ability to conceive. After their relationship ended, Devall initiated fertility treatment, removed Hardin's frozen sperm from the cryopreservation lab without his consent, had herself inseminated, became pregnant, and gave birth to a healthy boy (pseudonymously referred to as Mack). Hardin described these events as devastating, placing him in a "nightmare" that will last "forever."

During the pregnancy, Devall engaged in additional conduct that Hardin has asserted caused him additional distress and feelings of isolation. He testified that Devall intentionally misrepresented the sub-

stance and significance of a medical form she showed people throughout their small Louisiana community in an effort, he believed, to turn the community against him. He alleged that she showed community members a "screenshot" of Hardin's signature witnessing a HIPPA disclosure and intentionally misrepresented that it was his written authorization for her to be inseminated with his sperm. Hardin testified that Devall's active misrepresentation led to neighbors confronting him and "running me through the mud, calling me names, saying all evil things about me and my family."

Hardin sued Devall for intentional infliction of emotional distress (IIED), citing all of these acts by Devall. He also sued OGA for breach of contract. LeBlanc sued Devall for IIED and conversion and sued OGA for breach of contract and conversion. The jury found for Hardin and LeBlanc on all claims and awarded them damages for past mental anguish. The trial court granted a judgment n.o.v. that let stand the jury's findings on liability, but set aside the jury's award of mental-anguish damages, holding that mental anguish relating to the birth of a child is not a compensable injury as a matter of law.

 The issue in this case is whether Texas law prohibits Hardin and LeBlanc from recovering mental-anguish damages on their claims for IIED, conversion, and breach of contract. Our analysis is guided by two conflicting rules of law. The first is that "victims of conduct that is determined to be utterly intolerable in a civilized community" should have a "reasonable opportunity for redress" of their injuries. *Twyman v. Twyman*, 855 S.W.2d 619, 622–26 (Tex. 1993) (holding that wife could bring IIED claim against her husband and could do so within divorce proceeding subject to limitations preventing double recovery); *cf. Pat. H. Foley & Co. v. Wyatt*, 442 S.W.2d

904, 907 (Tex. Civ. App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.) (permitting mother of deceased son to recover mental-anguish damages on her breach-of-contract claim against entity that improperly prepared son's body for burial); *Wornick Co. v. Casas*, 856 S.W.2d 732, 734–35 (Tex. 1993) (setting forth elements of IIED claim and holding that defendant's conduct was not outrageous as matter of law because defendant may assert its legal rights in permissible way, even if assertion causes mental anguish). The second is that mental anguish stemming from the birth and rearing of a healthy child is not a compensable injury. *See Pressil v. Gibson*, 477 S.W.3d 402, 410–11 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (holding that plaintiff could not recover mental-anguish damages "in connection with the birth of healthy" children); *cf. Delgado v. Methodist Hosp.*, 936 S.W.2d 479, 484 (Tex. App.—Houston [14th Dist.] 1996, no writ) (stating another limitation on recovery of mental-anguish damages in context of breach-of-contract claim).

Both rules have developed from sound public policy. But because they cannot be applied harmoniously here, we must consider the policies underlying these rules to determine which must yield to the other and to what extent. Based on the intrinsic value of human life, the importance of promoting stable families, and the inherent difficulties in predicting and proving mental anguish under these circumstances, the public policy prohibiting recovery of mental-anguish damages relating to the birth and rearing of a child is, in our view, the more compelling line of reasoning and controls to the extent these two policies clash. Hardin's mental-anguish evidence, though, was not solely tied to his emotional response to Mack's birth and life; some of it was directly tied to separate acts by Devall when she intentionally disparaged him in

the community and caused him further mental anguish that was unrelated to Mack's birth.

We affirm the trial court's determination that mental anguish stemming from the birth of or relating to the rearing of a healthy child is not a compensable injury under these facts. But because there was mental-anguish evidence submitted to the jury by Hardin that was based on separate acts by Devall that go beyond the basis for the public-policy-based limitation, we remand Hardin's IIED claim against Devall for a new trial or other proceedings consistent with this opinion. On remand, Hardin may seek to recover damages arising from Devall's conduct during and after the pregnancy that relates to her misrepresentations about whether Hardin consented to release of the sperm and any of her other intentional efforts to stoke community outrage and alienation arising from those misrepresentations, subject to any defenses raised by Devall. Hardin may not, however, seek mental-anguish damages premised upon Mack's conception, birth, life, or rearing. We affirm the trial court's determination that LeBlanc's alleged mental anguish is not a compensable injury under these facts. We affirm the remainder of the trial court's judgment.

## Background[1]

In 2002, Layne Hardin and Katherine LeBlanc were in an ongoing intimate relationship and raising their three-year-old child. Hardin, who had two other children from other relationships, decided to have a

vasectomy. He and LeBlanc, both in their mid-30s, wanted to retain the option to have additional children and provide their son a younger biological sibling. To allow the possibility of more children in the future, they had eight vials of Hardin's sperm frozen and stored at a cryopreservation lab in Houston.[2] The agreement prepared by the storage lab and signed by both Hardin and LeBlanc stated that on "dissolution of the couple or divorce," LeBlanc would have dispositional authority over the use and storage of Hardin's cryopreserved sperm. The contract did not have a liquidated damages provision.

Three years later, Hardin began an intimate relationship with Tobie Devall, a 19-year-old woman who lived in the same small Louisiana community as Hardin and LeBlanc. The infidelity ended Hardin's relationship with LeBlanc. Thereafter, Hardin and Devall discussed having children together and that he had frozen sperm stored in a lab in Houston.

Devall and LeBlanc both testified that, in a 2007 phone conversation between the two that occurred while Devall and Hardin were dating, Devall disclosed to LeBlanc that Devall and Hardin were discussing having children. LeBlanc testified that she responded that the stored sperm belonged to her, not Hardin. Devall denied that LeBlanc told her that the sperm belonged to her.

Hardin testified, and Devall agreed, that they both believed Devall had physical impediments to conceiving a child regardless

---

1. No party challenges the sufficiency of the evidence that supports the liability findings against Devall or OGA. Nor does any party contend that the evidence was insufficient to support the amount of damages determined by the jury. Without such challenges, we accept as true that OGA breached its contract, OGA and Devall converted the sperm, and Devall engaged in outrageous conduct to

cause the severe emotional distress found by the jury. *See Trevino v. Munoz*, 583 S.W.2d 840, 842–43 (Tex. Civ. App.—San Antonio 1979, no writ).

2. At the time the sperm was stored, the lab was West Houston Fertility Center, Ltd. OGA later acquired all rights and liabilities of that entity.

of the source of sperm or method of insemination. Because they had concerns that Devall might not be able to conceive, they sought a medical opinion on the issue. The two traveled to Houston to visit OGA physician Dr. Schenk in March 2008. According to Hardin, those visits were merely to evaluate Devall's ability to conceive. He testified that he never gave Devall or OGA permission to release his sperm to Devall for insemination. LeBlanc likewise testified that she never authorized the release of the sperm. No written authorizations were admitted as evidence.

Over a year later, in the summer of 2009, when Hardin and Devall were no longer in a relationship, Devall began fertility treatment with Dr. Schenk. Hardin and Devall had a brief reconciliation in late September of that year. But even during the brief reconciliation, according to Hardin, Devall said nothing about the fertility treatments. After they broke up again, for the final time, Devall went to the OGA lab in October 2009, left the lab with two vials of Hardin's sperm, and used his sperm to be successfully inseminated.

The next month, Devall told Hardin that she was pregnant, but Hardin did not believe her. He thought his earlier vasectomy would have prevented unassisted fertilization. And he did not yet know that Devall had undergone fertility treatments at OGA during the preceding months or that she had convinced OGA to give her the sperm it contracted to store. Weeks later, to relieve his nagging concerns over Devall's statement, Hardin called the OGA lab and received confirmation that it had released the sperm to her. Hardin testified about his shock over these events and the effect they had on his life. He testified that when he found out what Devall had done, he immediately called Devall to confront her. He recorded the conversation, and the recording was played for the jury. In it, Hardin can be heard trying to elicit an admission by Devall that she took the sperm without his knowledge or consent. Devall responded by denying that she went to the OGA lab or that Hardin was Mack's father.[3] The confusion made Hardin feel as though he was "going stir crazy trying to put all of the pieces together." He felt betrayed and violated.

In the beginning of the pregnancy, Devall told Hardin that he would be able to see the child once born, but later she said she would not allow him any contact and that Hardin would need a court order to have access to the child. This added to Hardin's confusion and distress.

Word spread quickly in their small Louisiana town that Devall was pregnant and, eventually, that Hardin was the father through artificial insemination. There was evidence that Devall and her sister actively spread information in their community that Hardin was lying about his level of consent to the endeavor, even showing various community members a "screenshot" of a HIPPA consent form and falsely asserting that it was Hardin's signature authorizing the use of his sperm. This led to multiple people in the community making negative statements about Hardin, including accusing him of dishonesty. Hardin testified that Devall's deceit has led to people in the community saying "evil" things about him and confronting him. According to Hardin, the community is still talking about whether those forms show he consented. He described the situation as a "painful" "nightmare." He missed some work because he "didn't feel like getting

---

3. There is no dispute that these statements by Devall were false. Paternity tests proved that Hardin is Mack's biological father, and Devall admitted in her testimony that she was inseminated with Hardin's stored sperm.

out of bed." He testified, "This ripple effect continues to go on and on and on and there is no stopping. This is forever."

Hardin also testified that Devall did not allow him to be at the child's delivery, which left him "devastated." He was confused and distraught by Devall's actions and, as a result of her adamant statement that he could not see the child without a court order and in light of her new relationship with another man, he did not further engage Devall. He maintained his distance even after Mack was born and did not seek a legal right to visitation. Nor did he seek informal visits.

Louisiana law permits the adoption of a child who is the biological child of another and places the burden on the biological parent to oppose the adoption with evidence that the biological parent has manifested a substantial commitment to his parental responsibilities and is a fit parent of the child. *See* LA. CHILD. CODE arts. 1138, 1243, 1245. When Mack was two years old, Devall's new husband, C. Brown, petitioned to adopt Mack and have Hardin's parental rights terminated. Hardin challenged the action, arguing that he had attempted to visit and support Mack, but his efforts were thwarted by Devall. The trial court rejected Hardin's argument, finding no evidence of any effort by Hardin to support Mack and evidence of only one or two attempts to visit him during the first two years of his life. In the decree, which was introduced into evidence, the trial court found, "It appears it was in Layne [Hardin]'s best interest to maintain the status quo by not pursuing his parental rights and seeking to stay the adoption proceedings until his Texas litigation was completed." The trial court held that Hardin failed to establish that he manifested a substantial commitment to his parental responsibility, terminated Hardin's parental

rights, and approved Mack's adoption by Brown.

According to Hardin, he now plans his outings to avoid seeing Devall and Mack in their small community. He intentionally skips weddings and funerals to avoid "running into" Mack.

LeBlanc also testified that she experienced extreme emotional distress over having the sperm that had been assigned to her stolen. According to LeBlanc, she was in "disbelief" over what Devall had done; it was "devastating" and "life altering." When discussing that Devall and her sister had misrepresented that a HIPPA release proved that Hardin was lying about his consent to the insemination, LeBlanc explained that it was "violating" to have people she did not know well discussing the "private" matter. LeBlanc testified that she did not want what had occurred to "get out" and she tried "to not be confronted" in the community about it, but there was "no escape" because she was constantly asked about it at her son's events, the grocery store, and at work. It impacted her relationship with her son. LeBlanc described the "worry and anxiety" she felt as Mack's birth approached, stating that, after his birth, there would be a child out there that her son would be "tied to forever" which, in her words, "affects me as a mother."

When pressed that she had no documentation of medical visits to support her mental—anguish claim, LeBlanc, who had worked in law enforcement for 19 years in the community, testified, "[T]his topic is very embarrassing. It's very private. At times it's been humiliating. And [in] my line of work, I just can't go around saying that I'm involved in what people have called a Jerry Springer episode."

Hardin and LeBlanc sued Devall and OGA. Specifically, they claimed that OGA breached its sperm-storage contract, De-

vall and OGA converted the sperm, and Devall engaged in outrageous conduct and intentionally or recklessly caused severe mental anguish to both Hardin and Le-Blanc. Although Hardin repeatedly testified that Devall made false statements that damaged his reputation and caused him mental anguish, he did not assert a defamation claim. Through a counterclaim, Devall and OGA asserted that Hardin had fraudulently misrepresented his legal authority to authorize the use of his sperm and had consented to the sperm's release and use.

At the conclusion of the plaintiffs' evidence, Devall, joined by OGA, moved for a directed verdict on all claims, arguing, in part, that Hardin's and LeBlanc's claims were rooted in assertions of "wrongful pregnancy,"[4] that Texas law does not recognize a remedy for "wrongful pregnancy" for public policy reasons, and, as a result, mental-anguish damages are not recoverable under the theories Hardin and LeBlanc asserted. The trial court denied the motion.

### *The jury's verdict*

The jury found that (1) OGA breached the sperm-storage contract, (2) both OGA and Devall converted the sperm that the contract stated LeBlanc had the right to control, and (3) ·Devall engaged in outrageous conduct and, with the requisite intent, inflicted severe emotional distress on Hardin and LeBlanc. The jury rejected Devall's and OGA's fraud claims.

The jury awarded damages as follows:

4. The term "wrongful pregnancy" was explained in a recent opinion of the Fourteenth Court of Appeals, *Pressil v. Gibson*, 477 S.W.3d 402 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). A "wrongful pregnancy" claim is "simply a lawsuit brought by the parents of a healthy, but unexpected, unplanned, or unwanted child against a medical provider for negligence leading to conception or pregnancy." *Id.* at 408. "Texas does not recognize a unique cause of action called 'wrongful pregnancy.' " *Id.* (quoting *Zapata v. Rosenfeld*, 811 S.W.2d 182, 184 (Tex. App.—Houston [1st Dist.] 1991, writ denied)). Instead of being its own cause of action, the phrase refers to a form of medical malpractice claim brought against a medical provider, often following an unsuccessful sterilization procedure. *Id.* Such suits typically have involved claims to recover the economic loss associated with raising a child but have sometimes also sought recovery for mental anguish. *See, e.g., Terrell v. Garcia*, 496 S.W.2d 124, 125 (Tex. Civ. App.—San Antonio 1973, writ ref'd n.r.e.) (claim for economic loss); *Flax v. McNew*, 896 S.W.2d 839, 841 (Tex. App.—Waco 1995, no writ) (claim for economic loss, emotional distress, and other elements of damages).

1. Damages awarded against Devall

 A. Intentional Infliction of emotional distress

 (1) mental anguish suffered by Hardin $125,000 [5]

 (2) mental anguish suffered by LeBlanc $125,000 [6]

 B. Conversion

 (1) mental anguish suffered by LeBlanc $125,000[7]

2. Damages awarded against OGA

 A. Breach of contract

 (1) mental anguish suffered by Hardin $250,000

 (2) mental anguish suffered by LeBlanc $250,000

 B. Conversion

 (1) loss of value awarded LeBlanc $1,950

### The trial court's post-verdict order

Both defendants filed motions seeking judgment notwithstanding the verdict. The trial court held that the amounts awarded by the jury were supported by the evidence but that "mental anguish damages, whether under contract or tort, are simply not available" under the legal reasoning expressed in *Pressil*—an opinion issued after the conclusion of trial—because they were awarded to compensate "wrongful pregnancy" claims. *See* 477 S.W.3d at 408–10. The court rejected Hardin and LeBlanc's position that theirs was not a "wrongful pregnancy" suit and that they sought mental anguish only for the taking of the sperm and not for the birth of the child:

> [T]he Court suspects that had Devall taken the sperm and thrown it in the trash, or stored it somewhere else, this case would not have been filed. The taking of the sperm was for the purpose of the pregnancy, and resulted in the intended pregnancy. The Court rejects Plaintiff[s'] argument that the mental anguish damages found were unrelated to the "wrongful pregnancy."

The court left undisturbed LeBlanc's recovery of $1,950 against OGA for loss of value of the two vials of sperm removed from the lab.[8]

Both Hardin and LeBlanc have appealed.

**5.** The IIED claim was Hardin's only claim against Devall.

**6.** Through an election of remedies, LeBlanc elected to recover against Devall the conversion damages and abandon the IIED damages.

**7.** *See supra* at n.6.

**8.** OGA filed a motion for judgment n.o.v. on other grounds. The trial court could grant it judgment n.o.v. on the "wrongful pregnancy" issue to the extent the law supported such an outcome even without OGA moving on that basis. *See McDade v. Tex. Commerce Bank, Nat'l Ass'n*, 822 S.W.2d 713, 717–18 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (holding that trial court may grant judgment n.o.v. on grounds other than that presented in motion for judgment n.o.v., so long as the party receiving such relief did file motion).

### Issues Not Raised in this Appeal

We first highlight some of the issues that are outside the scope of this appeal before focusing our discussion on the issues before us. First, LeBlanc and OGA do not challenge by cross-appeal the applicability of conversion law to these facts. Conversion, an intentional tort,[9] is "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights."[10] No Texas case has addressed whether gametic[11] material, like sperm, is "property" for purposes of the tort of conversion,[12] and neither Devall nor OGA has filed a cross-appeal arguing that it is not.[13]

Second, we observe that Devall does not challenge the evidentiary sufficiency of the jury's findings that she committed the tort of IIED or the amount of damages awarded on that claim. Similarly, because it is not raised by the parties, we do not address whether any statements by Devall actionable under the law of defamation can also support an IIED claim.

Instead, the issue on appeal, as it relates to LeBlanc's conversion claim against Devall, Hardin's IIED claim against Devall, and Hardin's and LeBlanc's breach-of-contract claims against OGA, is whether the law, for reasons of public policy, bars mental-anguish damages on those claims because the item removed from the lab without necessary consent and in violation of the OGA contract was sperm that was successfully used to create a child and both Hardin and LeBlanc's testimony about their mental anguish related, at least in part, to the child's conception, birth, existence, and rearing.

### Availability of Damages for Mental Anguish

#### A. Standard of review

 A trial court may grant judgment notwithstanding a jury's verdict if, as

9. *See City of Houston v. Petroleum Traders Corp.*, 261 S.W.3d 350, 361 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

10. *Bandy v. First State Bank, Overton*, 835 S.W.2d 609, 622 (Tex. 1992) (quoting *Tripp Vill. Joint Venture v. MBank Lincoln Ctr., N.A.*, 774 S.W.2d 746, 750 (Tex. App.—Dallas 1989, writ denied)).

11. "Gametic" means pertaining to a mature sexual reproductive cell, either a sperm or egg. *See Gametic*, MOSBY'S MEDICAL DICTIONARY 718 (6th ed. 2002).

12. This court has addressed the enforceability of an agreement between a husband and wife with regard to the disposition of frozen preembryos, which are human ova that have been fertilized by sperm but not yet implanted in the uterus, but, in doing so, expressly did not address whether the frozen preembryos qualified as the couple's "joint property." *Roman v. Roman*, 193 S.W.3d 40, 44 n.7, 54 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *cf. Davis v. Davis*, 842 S.W.2d 588, 597 (Tenn. 1992) (refusing to characterize married couple's interest in preembryos as prop-

erty interest under general property law). Other jurisdictions have held that sperm, which has yet to be combined with an ovum to enter the preembryo stage, is property. *See In re Estate of Kievernagel*, 166 Cal.App.4th 1024, 83 Cal.Rptr.3d 311, 316 (2008) (holding that sperm is property within California Probate Code); *Hecht v. Superior Court*, 16 Cal. App.4th 836, 20 Cal.Rptr.2d 275, 283 (1993) (same); *see also Kurchner v. State Farm Fire & Cas. Co.*, 858 So.2d 1220, 1221 (Fla. Dist. Ct. App. 2003) (stating that "sperm outside of the body is property. . . .").

13. *See* TEX. R. CIV. P. 324(c) (stating that, on appeal of judgment n.o.v., appellee may bring cross-appeal to argue grounds contained in motion for judgment n.o.v. on which trial court did not rely in granting motion, but appellee's failure to bring cross-appeal "shall be deemed a waiver" of those arguments); *Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons of Tex. & Jurisdiction v. Jackson*, 732 S.W.2d 407, 411 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

a matter of law, there is no legal right to recovery. *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 320 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "A motion for judgment n.o.v. based on a legal principle is appropriately granted when it is conclusively established that recovery is precluded even though all the allegations are proven." *Id.* We review a determination that a legal principle precludes recovery under a de novo standard. *See id.; see also McCullough v. Scarbrough, Medlin & Assocs.*, 435 S.W.3d 871, 885 (Tex. App.—Dallas 2014, pet. denied).

 When a trial court grants judgment n.o.v. on a specified basis and an appellate court concludes that the ruling was erroneous, the proper disposition is to reverse and render judgment in harmony with the jury's verdict. *See Sw. Galvanizing, Inc. v. Eagle Fabricators, Inc.*, 383 S.W.3d 677, 681 (Tex. App.—Houston [14th Dist.] 2012, no pet.). On appeal of a judgment n.o.v., an appellee waives alternative arguments to support the judgment n.o.v. if she does not include those arguments as cross-points. *See* Tex. R. Civ. P. 324(c); *Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons of Tex. & Jurisdiction v. Jackson*, 732 S.W.2d 407, 411 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

## B. Whether Hardin may recover mental-anguish damages on his IIED claim

 We first consider whether Hardin may recover mental-anguish damages on his IIED claim. As the claim's name suggests, a plaintiff who prevails on a claim for intentional infliction of emotional distress normally may recover damages for mental anguish. *See Twyman*, 855 S.W.2d at 622. However, here, the rule permitting recovery of mental-anguish damages conflicts with another rule of law that prohibits recovery of mental-anguish damages that relate to the birth of a healthy child. *See Pressil*, 477 S.W.3d at 410.

Hardin denied, both in pleadings the trial court and in his brief on appeal, that he sought mental-anguish damages for Mack's birth.[14] The record demonstrates otherwise. In his testimony, Hardin linked his mental anguish, among other things, to Devall denying him access to Mack, terminating his parental rights, and, in a more general sense, setting in motion the events that have caused him to isolate himself to avoid an unexpected encounter with his estranged biological son. Thus, at least some of Hardin's mental anguish was caused by news that Devall had impregnated herself with his sperm and by the realization that Mack would be reared in the same small community where Hardin lives. As a result, these two rules on the recovery of mental-anguish damages—one allowing recovery and one prohibiting recovery—conflict. To determine which of these rules will govern the issue of mental-anguish damages and to what extent in this context, we begin our analysis by considering the circumstances under which these two rules apply and the policies on which they are based.

## 1. Why mental-anguish damages generally are recoverable in an action for IIED

14. In a pleading replying to OGA's opposition to Hardin and LeBlanc's motion for judgment, Hardin and LeBlanc argued, "Unlike the *Pressil* plaintiff, the Plaintiffs here made no claims for damages for having to support or raise a child: instead Plaintiffs' damages arise from the mental anguish of having their special contract breached and their sperm stolen and not the birth of the child." Hardin testified that he still would have experienced mental anguish if Devall failed to get pregnant, just from her stealing the sperm, though the mental anguish would have been "a little different."

The law of mental anguish damages is "rooted in societal judgments" concerning "the gravity of certain wrongs and their likely effects." *City of Tyler v. Likes*, 962 S.W.2d 489, 496 (Tex. 1997). Under Texas law, mental anguish is recognized as a "real and serious harm"; however, mental anguish may be difficult to predict and to verify. *Id.* at 494–95. Even when a person suffers actual mental anguish, in some circumstances, the difficulty with predicting and verifying mental anguish causes courts, on public policy grounds, to deny recovery to the harmed individual. *See id.* For example, Texas law does not recognize a general legal duty to avoid negligently inflicting mental anguish, and a person who suffers mental anguish but no personal injuries due to another's negligence is ordinarily denied recovery for that element of her damages. *Id.* at 495.

But because there is general reluctance to leave a legally injured plaintiff with no remedy at all, our common law has come "to look favorably on awarding mental anguish damages" under certain appropriate circumstances in which "the problems of foreseeability and genuineness are sufficiently mitigated...." *Id.* at 495–97. For example, mental-anguish damages are generally available for:

- *torts involving intentional or malicious conduct*, such as libel, battery, and *knowing violations of certain statutes*, like the Deceptive Trade Practices Act, as such conduct entails a high level of culpability, which affects the determination of proximate cause and makes it just that the defendant should bear the risk of any overcompensation through an award of mental-anguish damages;

- *personal injury actions*, as some degree of mental suffering may follow from bodily injury;

- *breaches of duties that arise out of certain special relationships*, such as the physician-patient relationship;

- *breaches of a very limited number of contracts that deal with intensely emotional noncommercial subjects*, such as the preparation of a corpse for burial or the delivery of news of a family emergency; and

- *injuries of such a shocking and disturbing nature* that mental anguish is a highly foreseeable result, including suits for wrongful death and actions by bystanders for a close family member's serious injury.

*Id.* at 495–96.

Mental-anguish damages also are generally available for intentional infliction of emotional distress—a "gap-filler" tort that was "created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann–La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004); *see also Twyman*, 855 S.W.2d at 622–26 (permitting IIED claim by wife in divorce proceeding). "To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Hoffmann–La Roche*, 144 S.W.3d at 445. These elements ensure that mental anguish in an IIED action is both foreseeable and genuine.

## 2. Why mental anguish based solely upon the birth of healthy children is not recoverable

The limitation on mental-anguish damages related to the birth of a

child is most frequently discussed in the context of "wrongful pregnancy" claims. "In general, a wrongful pregnancy action is simply a lawsuit brought by the parents of a healthy, but unexpected, unplanned, or unwanted child against a medical provider for negligence leading to conception or pregnancy." [15] *Pressil*, 477 S.W.3d at 408. In that context, when the plaintiff's injuries result from tortious conduct related to the use of the plaintiff's sperm without his permission, "mental anguish and economic harm in connection with the birth" are not recoverable. *Id.* at 410.

The prohibition on mental-anguish damages in this context is an extension of an earlier limitation that prevented those who became parents despite their efforts to contracept from recovering damages for the costs of rearing and educating their child under a wrongful-pregnancy claim. *See, e.g., id.*; *Crawford v. Kirk*, 929 S.W.2d 633, 637 (Tex. App.—Texarkana 1996, writ denied); *Terrell v. Garcia*, 496 S.W.2d 124, 127–28 (Tex. Civ. App.—San Antonio 1973, writ ref'd n.r.e.); *but cf. Flax v. McNew*, 896 S.W.2d 839, 841–45 (Tex. App.—Waco 1995, no writ) (holding in "wrongful pregnancy" suit that expenses of raising and educating child were not recoverable elements of damages but emotional distress was recoverable element).

Recently, our sister court, in *Pressil*, held that damages in a wrongful-pregnancy case were limited to the medical expenses associated with the procedure that produced twin boys. 477 S.W.3d at 410. In that case, a man and woman were in a consensual sexual relationship and used

condoms for birth control. *Id.* at 405. The man later learned that the woman had surreptitiously collected samples of his sperm from used condoms and took them to a fertility clinic, which inseminated the woman without his knowledge. *Id.* As a result, the woman became pregnant and eventually gave birth to twin boys. *Id.*

The man sued the clinic for negligence, conversion, violations of the Texas Theft Liability Act, and conspiracy. *Id.* He sought damages for mental anguish, loss of opportunity, loss of enjoyment of life, child support, the cost of raising two children, lost earnings, and lost earning capacity. *Id.*

The trial court dismissed the man's claims against the clinic with prejudice, and the man then sued his lawyers for legal malpractice. *Id.* at 406. In the legal malpractice suit, the trial court entered summary judgment in the attorneys' favor, finding that the man could not have succeeded in the underlying action. *Id.* The man appealed, and our sister court affirmed, holding that damages in the underlying suit against the fertility clinic were limited to the medical expenses associated with the insemination and that the woman—not the male plaintiff—had borne the costs of the procedure. *Id.* at 410.

In reaching its holding, the *Pressil* court noted a disagreement among Texas intermediate appellate courts regarding whether and the extent to which non-economic damages are available for a "wrongful pregnancy" claim related to medical negligence.[16] Following the earlier *Crawford*

---

**15.** A claim for wrongful pregnancy "usually arises after a negligently performed sterilization procedure." *Pressil*, 477 S.W.3d at 408. Claims for wrongful pregnancy "have also been predicated on the failure to properly diagnose a pregnancy or perform an abortion; negligence in the insertion or removal of an intrauterine birth-control device, or in dis-

pensing contraception prescriptions; or the failure of a contraceptive pill or a condom." *Id.*

**16.** *Compare Crawford v. Kirk*, 929 S.W.2d 633, 637–38 (Tex. App.—Texarkana 1996, writ denied) (limiting damages for "wrongful pregnancy" claim to medical expenses associated with negligently performed medical proce-

opinion issued by the Texarkana court of appeals [17] and rejecting the earlier *Flax* opinion issued by the Waco court of appeals,[18] *Pressil* held that "wrongful pregnancy" claims that are viable under Texas law limit damages to the recovery of related medical expenses and do not include mental-anguish damages.[19] *See* 477 S.W.3d at 410. The court also held that the plaintiff's other claims against the fertility clinic sounded in wrongful pregnancy even though presented with another name and, therefore, were subject to the same limitation against the recovery of mental-anguish damages related to the birth of the twins. *Id.* at 410–11.

The case law developed by Texas courts and by the courts of various other states allows for limited damages in cases arising out of the birth of children for a variety of reasons. Most often, damages have been limited because the courts refuse to characterize the birth of a healthy (but unwanted) child as a compensable legal injury. *See, e.g., Hickman v. Myers,* 632 S.W.2d

869, 870 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.) ("A parent cannot be said to have been damaged by the birth and rearing of a normal, healthy child."); *Terrell,* 496 S.W.2d at 125 ("[T]he birth of a normal child could not be considered an injury to the parents thereof....").[20] This line of reasoning reflects that our country and state have a strong public policy of preserving and protecting life and that one of the foundations of our justice system is the recognition of the dignity, sanctity, and profound value of life. *See, e.g.,* The Declaration of Independence para. 2 (U.S. 1776) ("We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness."); *Roper v. Simmons,* 543 U.S. 551, 578, 125 S.Ct. 1183, 1200, 161 L.Ed.2d 1 (2005) (explaining that our constitution includes provisions that "secure individual freedom and preserve human dignity" and that these "doctrines and guarantees are

dure, and as result, disallowing general damages), *with Flax,* 896 S.W.2d at 841, 843–45 (allowing only "limited damages" for "wrongful pregnancy" claim against negligent medical provider but including in that category of recoverable damages mother's pain and suffering during pregnancy and delivery, lost wages as result of her pregnancy and recovery, and her emotional distress).

17. *Crawford,* 929 S.W.2d at 637.

18. *Flax,* 896 S.W.2d at 841, 843–45.

19. In doing so, the *Pressil* court qualified our statement in *Zapata v. Rosenfeld,* 811 S.W.2d 182, 184 (Tex. App.—Houston [1st Dist.] 1991, writ denied), that "Texas does not recognize a cause of action for wrongful pregnancy," explaining that, while Texas does not have a "unique cause of action called 'wrongful pregnancy,'" it recognizes medical malpractice claims that many courts have described as "wrongful pregnancy" or "wrongful conception" actions. 477 S.W.3d at 408–09; *see also Flax,* 896 S.W.2d at 845 (con-

cluding that statement in *Zapata* was not supported by cited cases and was dicta).

20. This rationale is repeated in cases from other states. *See, e.g., Byrd v. Wesley Med. Ctr.,* 237 Kan. 215, 699 P.2d 459, 468 (1985) ("As a matter of public policy, the birth of a normal and healthy child does not constitute a legal harm for which damages are recoverable."); *Cockrum v. Baumgartner,* 95 Ill.2d 193, 69 Ill.Dec. 168, 447 N.E.2d 385, 389 (1983) ("In a proper hierarchy of values the benefit of life should not be outweighed by the expense of supporting it. Respect for life and the rights proceeding from it are at the heart of our legal system and, broader still, our civilization."); *Weintraub v. Brown,* 98 A.D.2d 339, 470 N.Y.S.2d 634, 641 (1983) ("As a matter of public policy we are unable to hold that the birth of an unwanted but otherwise healthy and normal child constitutes an injury to the child's parents and is, therefore, compensable in a medical malpractice action.").

central to the American experience").[21] Thus, our legal system recognizes that each human life, including that of Mack, has an innate basic worth protected by law.

Relatedly, damages have been limited because courts recognize that "the intangible benefits of parenthood far outweigh the associated monetary burdens.[22] *Pressil*, 477 S.W.3d at 409; *see Hickman*, 632 S.W.2d at 870 ("Rather than attempt to value intangible benefits which derive from rearing a child ... our courts have simply determined that ... these benefits to the parents outweigh their economic loss in rearing and educating a healthy, normal child."); *Terrell*, 496 S.W.2d at 128 (noting that "the satisfaction, joy and companionship which normal parents have in rearing a child" are "intangible benefits" that "outweigh" associated costs).

Wrongful pregnancy cases have also limited damages in claims arising from the birth of children to avoid adversely affecting the involved children.[23] *See Wilbur v. Kerr*, 275 Ark. 239, 628 S.W.2d 568, 571 (1982) (barring recovery of economic damages and explaining that contrary rule could cause "significant" damage to the child because the child "will some day learn that its parents did not want it and, in fact, went to court to force someone else to pay for its raising").

Likewise, various limitations on damages have been imposed to encourage parents to develop healthy, loving relationships with their children rather than to view them as legal injuries for which they must be compensated. *See Terrell*, 496 S.W.2d at 127 (precluding recovery of costs of rearing and educating child based on recognition of "family's importance to our society"); *Wilbur*, 628 S.W.2d at 571 (explaining that permitting recovery of damages for cost of raising child would "undermine society's need for a strong and healthy family relationship"); *see also Weintraub v. Brown*, 98 A.D.2d 339, 470 N.Y.S.2d 634, 641 (1983) ("We are loath to adopt a rule, the primary effect of which is to encourage, indeed reward, the parents' disparagement or outright denial of the value of their child's life.").

Finally, because the amount of emotional distress experienced as a result of

21. *See also* U.S. Const. amend. V ("No person shall be ... deprived of life, liberty, or property, without due process of law...."); U.S. Const. amend. XIV ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."); *Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971) (noting that our political system rests upon the premise of individual dignity); *Obergefell v. Hodges*, — U.S. —, 135 S.Ct. 2584, 2639, 192 L.Ed.2d 609 (2015) (Thomas, J., dissenting) (stating that Declaration of Independence refers "to a vision of mankind in which all humans are created in the image of God and therefore of inherent worth. That vision is the foundation upon which this Nation was built."); Justice William J. Brennan, Jr., Address at the Georgetown University Text and Teaching Symposium (Oct. 12, 1985) (stating that "the Constitution embodies the aspiration of ... human dignity that brought this nation into being.... For the Constitution is a sublime oration on the dignity of man.... [It] is a sparkling vision of the supremacy of the human dignity of every individual.") (available at http://www.teachingamericanhistory.org/library/index.asp?document=2342).

22. This is a limitation on recovery of economic damages "related to the support and maintenance of a healthy child." *Pressil*, 477 S.W.3d at 409.

23. This, too, is a limitation on recovery of economic damages related to the support and maintenance of a healthy child. *Wilbur v. Kerr*, 275 Ark. 239, 628 S.W.2d 568, 571 (1982).

unintended parenthood would vary greatly among different individuals, mental-anguish damages in wrongful pregnancy cases have been characterized as too speculative to be recoverable. *See, e.g., Crawford*, 929 S.W.2d at 637 (denying as speculative parents' claim for emotional suffering against physician who negligently performed sterilization procedure); *cf. Jacobs v. Theimer*, 519 S.W.2d 846, 849 (Tex. 1975) (holding that parents who sued doctor for negligent failure to diagnose child's affliction in utero could not recover mental-anguish damages because such award would be "based upon speculation as to the quality of life and as to the pluses and minuses of parental mind and emotion"); *but see Flax*, 896 S.W.2d at 841, 843–45 (holding that emotional distress was recoverable element of damages in "wrongful pregnancy" suit).

Hardin points to the medical-negligence or "wrongful pregnancy" context in which many of these damages limitations arise and seeks to distinguish his case, which is against the mother of his biological child, to arrive at a different result. But, as our sister court noted in *Pressil*, when a plaintiff's injuries arise from tortious insemination, the nature of the injury remains the same no matter the tort theory assigned to the claim. *See* 477 S.W.3d at 410–11. *Pressil* followed the reasoning in *Crawford* and held that "mental-anguish . . . in connection with the birth of healthy" children is not recoverable in a medical negligence suit. *Id.* at 410. And by extension, it is not recoverable when based on the same injurious conduct but pleaded as another tort. *See id.* at 411. We too see no principled reason why the rule limiting

damages should depend on the specific cause of action asserted. Regardless of the tort theory asserted, when a plaintiff alleges mental-anguish damages in connection with the birth of a healthy child, the same policy concerns arise.[24] Under any label, the recoverable damages do not include mental anguish premised on the birth and ongoing life of healthy children born as a result of the tortious conduct.

### 3. Hardin may not recover mental-anguish damages in connection with Mack's birth

Balancing the public policy interests underlying the availability of mental-anguish damages to compensate a plaintiff on an IIED claim against the public policy interests in not permitting mental-anguish damages for the birth of a child, we conclude that the latter outweigh the former and therefore hold that Hardin is precluded as a matter of law from recovering mental-anguish damages on his claim for IIED for the insemination, Mack's birth, and Devall and Brown's rearing of Mack in their small community.

We recognize that there are strong reasons for permitting recovery of mental-anguish damages in certain contexts. We also recognize that it is undisputed that Hardin suffered severe mental anguish as a result of Devall's misconduct. Nevertheless, the reasons for prohibiting recovery of mental-anguish damages premised upon the life of a child are more fundamental and therefore controlling when the mental anguish is based on the child's very existence. A just society respects the inherent value of human life and recognizes the importance of families.[25] Permitting Har-

---

**24.** We express no opinion on whether the reasoning of this opinion would extend to a different factual scenario in which no child was born. We are called on to decide the legal issues actually presented and limit ourselves

to that task. *See Tex. Ass'n of Business v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993).

**25.** Even to the extent that the possibility of a harmonious family outcome may be quite

din to recover this type of mental-anguish damages would do neither. To permit Hardin, as Mack's biological father, to pursue a tort claim for mental anguish arising from Mack's existence is to permit him to send a message to his son that the son's life injured his life. *See Wilbur*, 628 S.W.2d at 571. Such a message would demean Mack's dignity and value, could diminish his family's resources to provide for him, and could discourage parents such as Hardin from developing relationships with their children.

Hardin has argued that he is not seeking recovery for the birth of his child, but his testimony included as examples of mental anguish his emotional distress over Mack's delivery and rearing near him. When asked why he isolates himself from the community, Hardin testified that he stays in his house and has to plan his outings so that he can avoid seeing the child he has never met. He testified that he skips weddings and funerals to avoid "running into my son." He acknowledged that his mental anguish would have been "different" if Devall had stolen his sperm and not been successfully inseminated with it. Hardin testified about the emotional toll

of telling one of his oldest children about Mack and having to explain that there was a younger brother that the older child would never meet. Moreover, on cross-examination, Hardin was asked whether he was requesting the jury to "give [him] money for [the] birth of that child," to which he replied, "Yes." [26]

We conclude, on this record, that the emotional harm Hardin suffered as a result of Mack's birth for whom he owes no legal obligation or financial support[27] is not compensable legal harm on his IIED claim.[28] *O'Toole v. Greenberg*, 64 N.Y.2d 427, 488 N.Y.S.2d 143, 477 N.E.2d 445, 447–48 (1985) ("We believe, as a matter of public policy, that the birth of a healthy child does not constitute a cognizable legal harm for which an action in tort will lie.... Accordingly, we hold that the birth of a healthy child, as but one consequence of defendant's tortious conduct, does not constitute a harm cognizable at law."); *see Azzolino v. Dingfelder*, 315 N.C. 103, 337 S.E.2d 528, 533 (1985) (declining to recognize wrongful birth claims and deferring to Legislature to recognize such actions).

**4. Hardin is not prohibited as a matter of law from recovering damages for**

---

small here and made no more possible by this legal outcome than without it, this case will set a precedent for future cases and the rationale underlying this outcome will apply in other disputes when a biological parent brings a suit seeking mental-anguish damages arising from the theft of gametic material that leads to the birth of a child. *Cf. Phillips v. Irons*, No. 01-03-2992, 2005 WL 4694579, at *1–5 (Ill. App. Ct. 2005) (man asserted IIED claim against woman who surreptitiously retrieved his sperm from condom and used it for successful artificial insemination).

**26.** The mother of another of Hardin's children, K. Burge, testified about a conversation she had with Hardin upon realizing that Devall was pregnant with Hardin's child. She said he was crying. When asked to explain the crying episode, she testified that Hardin "[j]ust couldn't believe—you know, still hav-

ing kids and he wasn't even doing anything to have them."

**27.** Hardin's parental rights were terminated without his consent; therefore, he has no legal or financial obligation to Mack.

**28.** We note that events such as these that are said to involve intentional conduct against another's rights raise the issue of potential criminal liability. *See* Kristi Ayala, *The Application of Traditional Criminal Law to Misappropriation of Gametic Materials*, 24 Am. J. Crim. L. 503 (1997) (arguing for creation of criminal laws specifically governing the misappropriation of gametic materials from their original donor sources). As such, tort liability is not the exclusive means by which the law may be invoked to disapprove of conduct such as what occurred in this case.

**mental anguish not connected with Mack's birth**

As discussed, much of Hardin's mental-anguish evidence related to the insemination, Mack's birth, and Hardin's fears of interaction as Mack is reared in a close community. But Hardin submitted other evidence in support of his IIED claim against Devall that was not directly tied to Mack's existence. For example, he testified at trial about separate acts by Devall when she, in effect, initiated a campaign to turn the community against him by deceitfully painting a picture that Hardin had consented to her use of his sperm and then backed out and denied it, causing rampant gossip about him. He told the jury that this conduct caused him distress.

The trial court's order dismissing Hardin's mental-anguish damages included a statement that Hardin likely would not have filed suit if the pregnancy failed to produce a child and, on that understanding of the mental-anguish claim, held that it arose from the birth of a child and therefore was prohibited as a matter of law. We are not persuaded that all of Hardin's emotional reaction to Devall's tortious conduct was inextricably tied to the fact that a child was born. In our view, the jury here could have concluded that Hardin suffered severe emotional distress from Devall's community-wide vendetta even if, ultimately, no child resulted. Accordingly, we conclude that to the extent all of Hardin's mental-anguish damages were caused by Devall's conduct which was both tortious and actionable as IIED (matters not before us in this appeal), the trial court's judgment erroneously removed as a matter of law a measure of Hardin's mental-anguish damages based on distinct tortious acts which do not implicate the public-policy concerns discussed in this opinion.

We remand this portion of Hardin's suit in which he asserts a tort action based on Devall's treatment of him in the community for a new trial or other proceedings consistent with this opinion. *See* Tex. R. App. P. 43.3; *Rojas v. Duarte*, 393 S.W.3d 837, 846 (Tex. App.—El Paso 2012, pet. denied) (remanding in interest of justice because plaintiff proved liability and some damages but did not prove recoverable damages with reasonable certainty).[29]

We express no opinion on whether, on remand and with the presentation of this limited category of evidence, Hardin will be able to establish an IIED claim. We hold only that the possibility of mental-anguish damages in this case is not entirely foreclosed as a matter of law through an extension of *Pressil* or similar cases.

**C. Whether LeBlanc may recover mental-anguish damages on her conversion claim**

LeBlanc is differently situated from Hardin in some important respects. She had no genetic tie to Mack; therefore, she did not become an unintended parent, and her indifference to him would not be expected to inflict any emotional toll on the child. Nonetheless, much of her mental-anguish testimony concerned the anguish she felt as a parent to Hardin's other child. She testified about how Mack's birth would affect her son, which, in turn, "affects [her] as a mother." Much of the evidence regarding LeBlanc's damages was tied to the birth of a child and its impact on her and her son, not to the loss of a portion of the stored sperm and the impact of that loss on her.

LeBlanc never claimed that she suffered mental anguish because the theft of the sperm left her without the opportunity to use it to become pregnant herself. During

---

**29.** *See also* cases cited in n.32.

the decade between the signing of the sperm-storage contract and the time of trial, LeBlanc never attempted to become pregnant using any of the stored vials of sperm, including the six vials that remained at OGA after Devall removed two. Instead, LeBlanc claimed mental anguish because her son would now have a younger sibling, which would affect both her son and herself. She testified that her worry and anxiety increased as the delivery date approached because, after Mack's birth, there would be a child out there that her son would be "tied to forever" which would have an emotional effect on her in her role as her son's mother.

Thus, while LeBlanc's mental-anguish claim differs from other tortious insemination cases brought by biological parents of unwanted children, many of the same public policy concerns extend to encompass her claim, in that any anguish she suffered was borne from her desire to protect her son from this unwanted event. *See Pressil*, 477 S.W.3d at 410–11.

 In addition to the public policy concerns that are raised by LeBlanc's (and Hardin's) claims, the mental anguish that would be anticipated from the birth of a child with no genetic tie to the claimant is difficult to predict or verify, which further supports the denial of LeBlanc's mental-anguish damages in this context. *See Likes*, 962 S.W.2d at 494–95 (discussing speculative damages). There is a public policy against allowing the recovery of mental anguish damages that are speculative: "Although mental anguish is a real and serious harm," courts are reluctant to permit it as a measure of damages both when "it is difficult to predict," and when its existence "is inherently difficult to verify" even if it is a foreseeable result. *Id.*

As mentioned, the speculative nature of LeBlanc's damages is particularly acute because the stolen gametic material was not from her body. No issue in this case relates to her rights to her own body or her own genetic material. *Cf. Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 105 N.E. 92, 93 (1914) (stating, in discussion of informed consent doctrine in opinion by then-New York appellate Justice Benjamin Cardozo, "Every human being of adult years and sound mind has a right to determine what shall be done with his own body. . . .").

Thus, in addition to the public policy reasons for denying mental-anguish damages on this record for a non-parent's conversion claim,[30] we conclude that mental anguish in this context is too speculative for recovery. *Likes*, 962 S.W.2d at 494–95.

### D. Whether either Hardin or LeBlanc can recover mental-anguish damages on breach-of-contract claims against OGA

Hardin and LeBlanc sought recovery of mental-anguish damages under multiple causes of action, some against Devall and some against the cryopreservation lab owner, OGA. With regard to the claims against Devall, we have concluded that public policy prevents the recovery of any mental anguish by Hardin that is based on Mack's conception, birth, existence, or rearing, and we have concluded that LeBlanc's mental anguish is barred for the same reasons and because her mental anguish is too speculative to be recoverable. We consider now their breach-of-contract claims against OGA.

The sperm-storage agreement specified that, as a result of the dissolution of the relationship between Hardin and LeBlanc,

---

**30.** The same public policy reasons would prohibit recovery of mental anguish on LeBlanc's

IIED claim against Devall had she not abandoned it through her election of remedies.

LeBlanc had dispositional authority over the sperm, which was released from the OGA lab without the consent of either Hardin or LeBlanc and used to inseminate Devall. Those same events form the basis of the contract claim against OGA and part of the basis for the tort claims against Devall. Aside from Hardin's mental anguish that can be traced to Devall's disparagement of him in their community, the evidence of mental anguish was similar for Hardin and LeBlanc regardless of whether the anguish was prompted by Devall "stealing" the sperm or OGA wrongly releasing it to her—they both alleged mental anguish relating to the conception, birth, existence, and rearing of Mack. Thus, the public policy limitations on recovery of mental anguish experienced as a result of the conception, birth, existence, and rearing of a child apply with the same force to a contract claim as to a claim based in tort, as does the limitation on recovery of speculative mental anguish by LeBlanc. *Cf. Pressil*, 477 S.W.3d at 408–09 (prohibiting mental-anguish damages under multiple causes of action).

Hardin and LeBlanc argue for a different result on their contract claims against OGA, contending that those claims fall within a recognized exception to the general rule against recovery of mental-anguish damages when there is a "special relationship" that touches on familial sensitivities.

█ The general rule is that "most relationships, whether legal or personal, create no duty to avoid causing mental anguish." *Likes*, 962 S.W.2d at 496. There are "a very limited number of contracts" involving "special relationships" for which mental-anguish damages have been allowed. *See id.* For example, plaintiffs may recover mental-anguish damages on breach-of-contract claims against those with whom they contract to prepare a dead family member's body for burial, given the special relationship between the parties and the subject of their contract. *See Wyatt*, 442 S.W.2d at 907 (in context of funeral home's contract with mother for proper burial preparations for her dead son, primary considerations of contract were mother's "mental concern, her sensibilities, and her solicitude"). Likewise, mental-anguish damages were held recoverable on a breach-of-contract claim against a telegraph company based on evidence that the company contracted to timely deliver a telegraph, the purpose of the telegraph was to alert an individual that his brother was gravely ill, the telegraph company knew the intended recipient was waiting on the arrival of the telegraph so he would know when to travel to be with his dying brother, and the telegraph company's delayed transmission of the message caused the intended recipient to miss his brother's death and his funeral. *Stuart v. W. Union Tel. Co.*, 66 Tex. 580, 18 S.W. 351, 351–53 (1885).

### 1. Hardin's claim

█ Contracting with an entity to store one's own gametic material for future use arguably could create a special relationship analogous to contracting to properly handle a family member's deceased body. But we need not decide that issue because, even if it does, Hardin's alleged mental anguish that arose from the use of his gametic material was linked to its successful use to create life, thus directly implicating the same public policies discussed above.

█ When the mental anguish is because a child was conceived, born, and now exists, public policy precludes recovery of damages to compensate the mental anguish. *See Pressil*, 477 S.W.3d at 409–11. We hold that mental-anguish damages are not recoverable on a breach-of-contract claim based on the mishandling of gametic

material if the mental-anguish evidence is premised on the conception, birth, and existence of a healthy child as a result of the breach. In doing so, we decline to extend the holding in the corpse-mishandling and illness-notification cases to this case because, even if a special relationship were created, those precedents do not implicate the public policy concerns implicit in the recognition of mental-anguish damages relating to the conception, birth, and existence of a child.

To clarify, we do not hold that a special relationship can never be created in the context of a contract to store gametic material or that there can never be recovery of mental anguish for breach of such a contract. Other fact patterns may create a special relationship and may implicate public policy concerns that do not align with those raised under these facts, in which a healthy child was born.[31]

The trial court did not err in determining that Hardin is precluded from recovering mental-anguish damages against OGA as a matter of public policy and law.

### 2. LeBlanc's claim

 LeBlanc did not contract to have her own gametic material stored. The contract with OGA specified that upon "the dissolution of the couple" who had arranged for the storage of the sperm, as had occurred here, LeBlanc had dispositional control over another's gametic mate-

rial. Thus, her claimed connection to the sperm OGA released to Devall was based on a contract and the fact that any child produced with the sperm would have a biological connection to her son. In the context of this case in which only a portion of the stored sperm was lost and a majority remained available for the purpose originally intended by the parties to the contract, LeBlanc's mental anguish resulting from the mishandling of some of the sperm, which was not her gametic material, necessarily would be somewhat more remote than that experienced by Hardin, who would be the biological father of any child produced with it. And LeBlanc's mental-anguish damages would be equally speculative in this breach-of-contract claim against OGA as it is in her conversion claim against Devall. *See Likes*, 962 S.W.2d at 494–95 (discussing speculative damages). OGA released two vials of sperm to Devall without LeBlanc's consent. Yet six vials remained for LeBlanc's use, had she been inclined to use them. OGA's action, though found to be a breach of its contractual duties, was not shown to have denied LeBlanc the ability to conceive a child with Hardin's stored sperm. There is no support for mental anguish on that basis. Instead, the evidence was that any mental anguish experienced by LeBlanc would be linked to the successful use of the sperm for procreation by another. When only a portion of stored gametic

31. We note that the issue of whether a sperm-storage contract creates the level of a special relationship that can give rise to mental-anguish damages upon breach raises a multitude of competing public policy concerns. This appears, at this point, to be a mostly unregulated industry. *See* Ruth Macklin, Ph. D., *Variations in Regulations on Assisted Reproductive Technologies*, THE DOCTOR'S TABLET BLOG (June 15, 2015), http://blogs.einstein.yu. edu/variations-in-regulations-on-assisted-reproductive-technologies/ (stating that no federal laws or regulations governing assisted

reproduction exist but some states have piecemeal legislation); *see also* TEX. FAM. CODE § 160.701–.707 (setting forth limited regulations for identifying paternity status in context of assisted reproduction). An analysis of emerging assisted reproductive technologies and guidance from the Legislature on contracting within these technologies would aid parties in future disputes. *See Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 665 (Tex. 2008) (stating that Legislature determines public policy through statutes it passes).

material is lost, the option to use the remaining material in the future still exists. To the extent the facts establish, as they do here, that most of the stored gametic material remains available for use as intended by the parties as stated in the storage contract, we conclude that mental anguish from the loss of some but not all of another's gametic material is too speculative for recovery under a breach-of-contract claim asserted against the storage facility that wrongly released the material.

The trial court did not err in concluding that LeBlanc is precluded from recovering mental-anguish damages against OGA as a matter of law.

## Conclusion

We have concluded that LeBlanc is precluded from recovering mental anguish under all asserted theories on public policy grounds. We affirm the judgment n.o.v. as to her.

Hardin is precluded from recovering mental anguish on his breach-of-contract claim against OGA. Hardin also is precluded from recovering mental anguish as it relates to Mack's conception, birth, life, and rearing. We, therefore, affirm this portion of the trial court's judgment n.o.v. However, Hardin is not precluded on public policy grounds from recovering mental anguish based on Devall's separate tortious conduct directed towards him that caused an additional emotional response not contingent on his feelings about Mack's existence. We, therefore, reverse the judg-ment n.o.v. as to his IIED claim against Devall.

Hardin correctly describes this case as "novel." Indeed, the parties have not identified nor have we located any prior Texas court opinion addressing the recoverability of mental-anguish damages on a claim of IIED against a co-parent arising out of the theft of gametic material. The trial court and parties had no precedent for determining the admissibility of evidence or the proper jury charge. Accordingly, we remand Hardin's IIED claim for a new trial or further proceedings in the interest of justice utilizing these legal principles.[32]

On remand of Hardin's IIED claim against Devall, he may, subject to any applicable defenses, seek to recover damages arising out of Devall's tortious conduct during and after the pregnancy that relates solely to misrepresentations by her about whether he consented to the release of his sperm. We express no opinion on the viability of such claims. He may not, however, seek damages related to Mack's conception, birth, life, or rearing.

All other portions of the trial court's judgment are affirmed.

32. _See_ Tex. R. App. P. 43.3(b); _cf. Humble Sand & Gravel, Inc. v. Gomez_, 146 S.W.3d 170, 195 (Tex. 2004) ("Because the parties have not focused on the issue we think is crucial, we conclude that the interests of justice would be best served by a new trial."); _Torrington Co. v. Stutzman_, 46 S.W.3d 829, 840 (Tex. 2000) ("our rules allow us to remand in the interest of justice when appropriate, even if rendition would ordinarily be warranted"); _Twyman_, 855 S.W.2d at 625–26 (remanding in interest of justice because case was tried on theory since rejected and facts were not developed to support alternate theory); _Boyles v. Kerr_, 855 S.W.2d 593, 603 (Tex. 1993) ("We have broad discretion to remand for a new trial in the interest of justice where it appears that a party may have proceeded under the wrong legal theory.").